[No. F043498. Fifth Dist. Aug. 5, 2004.]

SFPP, L.P., Plaintiff, Cross-defendant and Appellant, v.
THE BURLINGTON NORTHERN & SANTA FE RAILWAY CO.,
Defendant, Cross-complainant and Respondent;
KINDER-MORGAN, INC., Cross-defendant and Appellant.

COUNSEL

Manatt, Phelps & Phillips, Mark D. Johnson and Matthew S. Urbach for Plaintiff, Cross-defendants and Appellants.

Gresham Savage Nolan & Tilden, John C. Nolan and Marlene Allen for Defendant, Cross-complainant and Respondent.

OPINION

DAWSON, J.—A railroad and a pipeline company had a dispute over whether a pipeline existing in the railroad's right-of-way should be moved before the railroad built a second track in the right-of-way. The pipeline company refused to move the pipeline and filed a lawsuit to condemn a five-foot easement around the existing location of the pipeline. The parties agreed to employ a retired judge to decide the case as a referee pursuant to Code of Civil Procedure sections 638 and 644, subdivision (a).[1] The referee filed a written statement of decision holding that the proposed easement was not located in the manner most compatible with the greatest public good as required by section 1240.030, subdivision (b) and, accordingly, ruled in favor of the railroad.

The pipeline company appeals, claiming that the referee committed legal errors in applying the condemnation statute and that the decision was not supported by substantial evidence. We conclude that the doctrine of implied findings derived from section 634 is applicable to the statement of decision, that the referee correctly applied section 1240.030, and that the express and implied findings of fact are supported by substantial evidence. Thus, the judgment entered below is affirmed.

## FACTS

Respondent Burlington Northern and Santa Fe Railway Company (BNSF) or its predecessor in interest has maintained and operated a railroad main line right-of-way though Central California for over 100 years.

Appellants SFPP, L.P., a Delaware limited partnership (SFPP), and its affiliate Kinder-Morgan, Inc. (Kinder-Morgan), a nationwide petroleum pipeline operator, have a petroleum terminal with storage tanks located in southern Fresno, immediately to the east of BNSF's right-of-way. The

---

[1] All subsequent statutory references are to the Code of Civil Procedure unless otherwise indicated.

terminal is serviced by a pipeline distribution system operated by SFPP. The distribution system includes pipeline located in BNSF's right-of-way.

The facts that led to the dispute between SFPP and BNSF were set forth in the statement of decision as follows:

"[P]ursuant to various licensing agreements between the parties' predecessors in interest, a portion of the pipeline distribution system running between Concord and Bakersfield that SFPP operates and maintains is located within BNSF's right-of-way. This pipeline carries gasoline, jet fuel, and diesel to a distribution center in Fresno; this center is the major distribution center in the greater Fresno area. The pipeline also transports jet fuel to the Lemoore Naval Air Station, and is the only such pipeline servicing the Naval Air Station. BNSF, or its predecessor in interest, has maintained and operated a railroad main line right-of-way through Central California, extending from Bakersfield in the south to Port Chicago in the San Francisco Bay Area in the north, for over one hundred years. Originally the railroad right-of-way was exclusively single track but, as rail traffic increased, several areas expanded to double track. By federal law, railroads are required to make their rights-of-way available for use by AMTRAK, which provides long distance and commuter rail passenger service; in California, the State's Department of Transportation [CALTRANS] has entered into various agreements with AMTRAK to provide additional equipment and costs, enabling AMTRAK to increase passenger rail services and thereby reducing highway congestion and the need to build additional highways.

"In an effort to increase on-time performance, reduce travel times, and increase ridership, CALTRANS had BNSF conduct a study to determine what areas of train traffic were most impacted by congestion. That study concluded that converting an approximate 8.4 mile portion of BNSF's Calwa to Bowles right-of-way to double track would greatly reduce congestion and passenger travel time. Thereafter in or about September 2000 CALTRANS and BNSF entered into an agreement to expand the railroad tracks in this location.

"Once BNSF determined that it would be constructing a second track in this location, it notified all utilities utilizing the right-of-way of the impending construction and requested that the utilities, pursuant to their various licenses, move their pipes, wires, etc. so as not to interfere with the proposed second track. All utilities except SFPP agreed to do so and have now relocated their equipment. After some correspondence and discussion between the parties, SFPP refused to pay to relocate any portion of its pipeline, alleging that there was no legal or safety issue basis for doing so.

"The licensing agreements under which SFPP operated its pipeline in BNSF's right-of-way provided that:

" '4. [SFPP] shall, at its own cost and subject to the supervision and control of [BNSF], locate, construct and maintain the PIPELINE in such a manner and of such material that it will not at any time be a source of danger to or interference with the present or future tracks, roadbed and property of [BNSF], or the safe operation of its railroad. [¶] . . . [¶]

" '7. If at any time [SFPP] shall fail or refuse to comply with or carry out any of the covenants herein contained [BNSF] may at its election forthwith revoke this License.

" '8. THIS LICENSE is given by [BNSF] and accepted by [SFPP] upon the express condition that the same may be terminated at any time by either party upon ten (10) days' notice in writing to be served upon the other party, stating therein the date that such termination shall take place, and that upon the termination of this License in this or any other manner herein provided, [SFPP], upon demand of [BNSF], shall abandon the use of the PIPELINE and remove the same and restore the right of way and tracks of [BNSF] to the same condition in which they were prior to the placing of the PIPELINE thereunder. In case [SFPP] shall fail to restore [BNSF's] premises as afore-said within ten (10) days after the effective date of termination, [BNSF] may proceed with such work at the expense of [SFPP]. No termination hereof shall release [SFPP] from any liability or obligation hereunder, whether of indemnity or otherwise, resulting from any acts, omissions or events happening prior to the date the PIPELINE is removed and the right of way and track of [BNSF] restored as provided above.'

"Exhibits 6, 7 and 8.

"Upon SFPP's refusal to relocate the pipeline, BNSF sent a letter, dated October 24, 2001, terminating the license agreements, citing both paragraphs 7 and 8 of the licensing agreements, and demanding that SFPP remove the pipeline and restore the right-of-way and tracks to their previous condition. Exhibit 222. On November 14, 2001, SFPP filed a Complaint in Eminent Domain in the instant action, seeking to condemn a five foot wide easement for purposes of operating and maintaining the pipeline. In response, BNSF filed a Cross-Complaint for Declaratory Relief, seeking a declaration that SFPP had no on-going rights to maintain its pipeline within the right-of-way and that BNSF was entitled to move the pipeline and charge SFPP for the cost of that move."

One of the pipelines servicing SFPP's Fresno terminal is 12 inches in diameter and approaches BNSF's right-of-way from the northwest as it runs parallel to South Golden State Boulevard (12" Line Section 60). The 12" Line Section 60 enters BNSF's right-of-way in the area where the right-of-way intersects with South Golden State Boulevard and runs approximately

5,787 feet south where it leaves the right-of-way and enters SFPP's Fresno terminal. Cover over the 12" Line Section 60 varies from three to nine feet deep.

The pipeline used in delivering jet fuel to the Lemoore Naval Air Station is a multidimensional line (Line Section 119) which leaves the Fresno terminal and runs south on the east side of the right-of-way before turning west, crossing under the track, and exiting the right-of-way. The length of Line Section 119 occupying the right-of-way is approximately 737 feet. Cover over the Line Section 119 varies from seven to 10 feet deep.

BNSF intends to install the second track to the east of its existing track. To make room for the second track, BNSF requested that SFPP move its pipelines to the other side (west) of the existing track. BNSF intends the centerline of the proposed second track to be a minimum of 25 feet from the centerline of the existing track because that distance would allow it to perform maintenance on either line without closing both tracks. Also, BNSF asserts that the second track must be placed to the east of the existing track because the existing track is located near the western edge of two under-passes, and placing the second track to the west of the existing track would require reconstruction of the underpasses at the cost of several million dollars.

SFPP does not dispute this assertion regarding the inadequacy of space for another track on the west side of the existing track, but contends that the proposed track can be added in its intended location without moving the pipelines from their current locations.

A report prepared for CALTRANS by the Parsons Transportation Group states that the 12" Line Section 60 currently is located from eight to 19 feet from the centerline of the proposed second track. The report concludes that locating the pipeline 25 feet from the track would lessen the risk of pipeline rupture and avoid the need to close the proposed track for pipeline mainte-nance. The report bases its conclusion on a consideration of (1) the risk of damage to the pipeline from (a) the construction and maintenance of the second track, (b) a train derailment, and (c) cleanup and repair equipment used after a derailment,[2] (2) the risk that a small leak in the pipeline will weaken the subgrade soil and pose a fire hazard by saturating the soil over an extended period of time, and (3) the delays and interruptions to rail service

---

[2] The report describes a pipeline rupture that occurred near San Bernardino, California in 1989 where the pipeline paralleling the track was ruptured near the end of cleanup activity approximately 13 days after a derailment. Two people were killed, 19 were injured and 11 homes were destroyed as a result of the rupture in the pipeline.

caused by (a) significant pipeline repairs, (b) less intrusive repairs and maintenance of the pipeline, and (c) integrity verifications.

## PROCEEDINGS

When negotiations between the parties broke down, SFPP filed a complaint seeking to condemn a five-foot easement around the current location of the pipelines. BNSF filed a cross-complaint for declaratory relief in December 2001 against SFPP as well as Kinder-Morgan and filed an answer to the complaint the next month. In April 2002, SFPP and Kinder-Morgan answered the cross-complaint and shortly thereafter SFPP filed its final offer to BNSF of $21,725 for the easement it sought to condemn.

By agreement of the parties, this case was tried before a retired superior court judge acting through Judicial Arbitration and Mediation Services.[3] Initially, the appellate record did not contain the written agreement of the parties regarding the general reference of the matter to the referee. This court brought the omission to the attention of the parties in a letter raising issues for supplemental briefing. (See Gov. Code, § 68081.) Subsequently, the parties jointly requested to augment the record on appeal by including a document titled "Stipulation Re Reference of Suit Pursuant to Code of Civil Procedure Sections 638 and 644," which contained a related order and was filed in the superior court on January 29, 2003 (Stipulation of Reference). The Stipulation of Reference provides in part:

"1. The above-captioned matter is transferred and referred to [the referee] pursuant to Code of Civil Procedure sections 638 and 644 for all remaining matters including trial.

"2. All proceedings shall be conducted in accordance with the Code of Civil Procedure and the Evidence Code as well as all other applicable statutory and case law as if the proceedings were conducted by the Superior Court of the State of California.

"3. Pursuant to Code of Civil Procedure section 644, all decisions, rulings and/or Judgment rendered by [the referee] shall not be advisory but shall be the decision of this Superior Court and shall be subject to all the same rights of appeal and/or review as if made directly by a Judge of this Court."

The case was tried before the referee without a jury from March 24 through 28, 2003. On May 9, 2003, a 17-page document titled "Statement of

---

[3] The statutory term "referee" (see § 638) shall be used to identify the retired superior court judge in the remainder of this opinion.

Decision" prepared by the referee was served on the parties and the superior court. The last paragraph of the statement of decision provides:

"The Court awards judgment to Defendant BNSF on the Complaint and to Cross-Complainant BNSF on the Cross-Complaint. BNSF is to prepare the appropriate judgment and submit it *directly to the Fresno Superior Court* for entry." (Italics in original.)

The appellate record does not contain (a) a "tentative decision," (b) any "proposals as to the content of the statement of decision," (c) a "proposed statement of decision," (d) "objections to [any] proposed statement of decision," or (e) a "proposed judgment" (see Cal. Rules of Court, rule 232 (rule 232) [quoted terms are used in the corresponding paragraphs of that rule]).

On May 19, 2003, the superior court filed an entry of judgment stating:

"Pursuant to the stipulation and order filed January 29, 2003 and the Statement of Decision issued by [the referee] dated May 7, 2003, judgment is entered in favor of Defendant BNSF on the complaint and judgment is entered in favor of Cross-Complainant BNSF on the cross-complaint."

The appellate record does not contain (1) a motion for new trial, (2) a motion to vacate the judgment, or (3) any document filed prior to the entry of judgment that challenged the statement of decision or asserted it contained an omission or ambiguity. In July 2003, SFPP and Kinder-Morgan filed a notice of appeal from the judgment.

## DISCUSSION

### I. *Standard of Review*

#### A. *Substantial Evidence Rule and Implied Findings of Fact*

■ Generally, appellate courts independently review questions of law[4] and apply the substantial evidence standard to a superior court's findings of fact. (See *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801 [35 Cal.Rptr.2d 418, 883 P.2d 960] [questions of law are subject to independent review]; *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]

---

[4] The questions of law raised in this appeal include (1) the construction of the provisions of the Code of Civil Procedure that (a) govern voluntary general references and (b) contain California's eminent domain law, and (2) the application of those statutory provisions to the facts as found by the referee. (See *Twedt v. Franklin* (2003) 109 Cal.App.4th 413, 417 [134 Cal.Rptr.2d 740].)

[substantial evidence rule].) The substantial evidence standard for review has been described by our Supreme Court as follows:

"Where findings of fact are challenged on a civil appeal, we are bound by the 'elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. (*Crawford v. Southern Pacific Co.*[, *supra*,] 3 Cal.2d 427, 429 [45 P.2d 183].) We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 [190 Cal.Rptr. 355, 660 P.2d 813].)

■ The substantial evidence standard applies to both express and implied findings of fact made by the superior court in its statement of decision rendered after a nonjury trial. (See *Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792–793 [218 Cal.Rptr. 39, 705 P.2d 362] [implied findings].) The doctrine of implied findings is based on our Supreme Court's statutory construction of section 634 and provides that a "party must state any objection to the statement in order to avoid an implied finding on appeal in favor of the prevailing party. . . . [I]f a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient . . . and hence the appellate court will imply findings to support the judgment." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133–1134, fn. omitted [275 Cal.Rptr. 797, 800 P.2d 1227].) Stated otherwise, the doctrine (1) directs the appellate court to presume that the trial court made all factual findings necessary to support the judgment so long as substantial evidence supports those findings and (2) applies unless the omissions and ambiguities in the statement of decision are brought to the attention of the superior court in a timely manner. (*Ibid.*; see Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2003) ¶ 8:23, p. 8-8; see generally, §§ 632, 634; rule 232.)

### B. *Statement of Decision of Referee After General Reference*

Consensual general references are governed by sections 638 and 644. Both of these sections were mentioned in paragraph 1 of the Stipulation of Reference. Section 638 provides in relevant part:

"A referee may be appointed upon the agreement of the parties filed with the clerk, or judge, or entered in the minutes, or upon the motion of a party to a written contract or lease that provides that any controversy arising therefrom shall be heard by a referee if the court finds a reference agreement

exists between the parties: [¶] (a) To hear and determine any or all of the issues in an action or proceeding, whether of fact or of law, and to report a statement of decision."

The portion of section 644 applicable to the general reference in this case states:

"(a) In the case of a consensual general reference pursuant to Section 638, the decision of the referee or commissioner upon the whole issue must stand as the decision of the court, and upon filing of the statement of decision with the clerk of the court, or with the judge where there is no clerk, judgment may be entered thereon in the same manner as if the action had been tried by the court."

The procedures for challenging a statement of decision rendered by a referee after a consensual general reference are not set forth in detail by the statutes. Instead, section 645 broadly states that "[t]he decision of the referee appointed pursuant to Section 638 or commissioner may be excepted to and reviewed in like manner as if made by the court." Although this language appears straightforward and clear, uncertainty exists over its application. (See Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2003) ¶¶ 6:230 to 6:231.3, pp. 6-57 to 6-58 [discussing uncertainty regarding application of § 645 to a consensual general reference].)

The uncertainty arises because the statutory scheme creates differences between the procedures followed by a referee in making a decision and by the court in reducing that decision to a judgment, on one hand, and the procedures followed by a superior court judge in doing the same thing, on the other hand. Thus, where differences exist, the referee's decision is not made in a "like manner as if made by the court." (§ 645.) When the manner in which the referee's decision is made is procedurally different, the question becomes whether that difference has any impact on the manner for "except-[ing] to and review[ing]" (§ 645) the decision of the referee.

█ The answer to this question is not derived solely by statutory construction because the proper way to challenge and review a referee's statement of decision may be complicated, clarified or unaffected by the agreement of the parties to the general reference. Specifically, subdivision (b) of section 643 provides that "[a] referee appointed pursuant to Section 638 *shall report as agreed by the parties* and approved by the court."[5] (Italics

---

[5] Subdivision (a) of section 643 provides: "Unless otherwise directed by the court, the referees or commissioner must report their statement of decision in writing to the court within 20 days after the hearing, if any, has been concluded and the matter has been submitted."

added.) Thus, the parties have some flexibility in specifying the procedures a referee will follow in reporting a decision.

In this case, we must consider both the statutory provisions and the agreement of the parties in determining the proper way to challenge and the proper way to review the statement of decision. In the course of our review of this appeal, questions arose regarding the applicability of the doctrine of implied findings to the referee's statement of decision. We therefore directed the parties to submit supplemental letter briefs.

In response, the parties jointly agreed to augment the appellate record to include the Stipulation of Reference and presented their arguments concerning the interpretation of that document. Although both BNSF and appellants believe the broad language in the Stipulation of Reference means they impliedly addressed the question of whether the doctrine of implied findings applied to the referee's decision, they have opposing views on the answer to that question. BNSF contends they agreed the doctrine of implied findings would apply and appellants contend they agreed the doctrine would not apply.

■ BNSF's view is as follows. A stipulation to a general reference under subdivision (a) of section 638, which also specifically invokes the provisions of section 644, calls into play all of the legal rules and doctrines generally applicable to a statement of decision rendered by a superior court judge. Among the provisions invoked by the general language used are the requirements of rule 232(d), which provides for the filing of objections to a proposed statement of decision or judgment, and the statutory limitation in section 634, which establishes the scope of the doctrine of implied findings. Because the Stipulation of Reference did not exclude the application of section 634 and rule 232, it follows from the parties' general language that they intended those provisions would apply to the referee's statement of decision.

Appellants argue that "[t]he stipulation was expressly entered into pursuant to . . . sections 638 and 644 [citation]. Therefore, it implicitly rendered the doctrine of implied findings inapplicable to this appeal." To support this conclusion, appellants point out that the referee did not comply with the steps set forth in rule 232 in that the referee did not provide the parties with (1) a tentative statement of decision, (2) any proposals as to the content of the statement of decision, (3) a proposed statement of decision, or (4) a proposed judgment. Instead, the referee filed the statement of decision with the superior court and simultaneously provided it to the parties. Appellants assert that, once the statement of decision is filed, the judgment must be entered

immediately[6] and, consequently, they had no opportunity to challenge ambiguities or omissions in the statement of decision and their right to object was limited to moving for a new trial or filing an appeal.

By the terms of their Stipulation of Reference, the parties agreed that "[a]ll proceedings shall be conducted in accordance with the Code of Civil Procedure and the Evidence Code as well as all other applicable statutory and case law as if the proceedings were conducted by the Superior Court of the State of California." This general language is not ambiguous. Section 634 is contained in the Code of Civil Procedure and, therefore, is applicable to the proceeding. It follows that the doctrine of implied findings, which is derived from section 634, also is applicable. Furthermore, the statutory provisions that govern consensual general references do not alter the effect of the general language contained in the Stipulation of Reference. The statutory provisions state that the referee shall report as agreed by the parties (§ 643, subd. (b)) and exceptions to the decision of the referee may be made in like manner as if the decision had been made by the superior court (§ 645). These provisions allow the parties to agree the proceedings will be conducted in accordance with the Code of Civil Procedure, including section 634.

Consequently, we agree with BNSF's view that the broad language of the Stipulation of Reference means that section 634 and the doctrine of implied findings derived from that section apply to the referee's decision. In addition, we disagree with appellants' position that the procedures actually followed by the referee deprived them of the opportunity to object to deficiencies in the statement of decision prior to appeal. Section 634 provides:

"When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court either prior to entry of judgment or in conjunction with a motion under Section 657 or 663, it shall not be inferred on appeal or upon a motion under Section 657 or 663 that the trial court decided in favor of the prevailing party as to those facts or on that issue."[7]

In accordance with the terms of section 634, appellants could have (1) filed objections to the statement of decision prior to the entry of judgment on May 19,

---

[6] We accept for purposes of argument this characterization of the entry of judgment as mandatory and immediate. Nonetheless, we note that section 644, subdivision (a) does not state the judgment "shall be entered immediately" but that "judgment may be entered thereon in the same manner as if the action had been tried by the court." (§ 644, subd. (a).)

[7] Section 657 contains the standards and procedure for motions for new trial, and section 663 sets forth the grounds on which a motion to vacate a judgment may be granted.

2003, or (2) filed a motion under section 663 asserting the judgment should have been set aside because it was not supported by the facts and had an erroneous legal basis.

First, under the terms of section 634, appellants could have brought any claimed deficiencies, such as the claim that the referee did not find the pipeline's interference with the proposed second track unreasonable, to the attention of the superior court after the statement of decision was served (May 9, 2003) and before the judgment was entered (May 19, 2003).

Second, section 663 provides in part:

"A judgment . . . , when based upon a decision by the court . . . may, upon motion of the party aggrieved, be set aside and vacated by the same court, and another and different judgment entered, for either of the following causes, materially affecting the substantial rights of the party and entitling the party to a different judgment: [¶] 1. Incorrect or erroneous legal basis for the decision, not consistent with or not supported by the facts; and in such case when the judgment is set aside, the statement of decision shall be amended and corrected."

Because a motion to vacate the judgment was available to appellants, they had a postjudgment mechanism for challenging any claimed omissions or ambiguities contained in the referee's statement of decision. (See *National Union Fire Ins. Co. v. Nationwide Ins. Co.* (1999) 69 Cal.App.4th 709, 716 [82 Cal.Rptr.2d 16] [a general reference "preserve[s] the court's power regarding new trial motions and other postjudgment remedies"].)

Thus, appellants' claim that they had no opportunity to object to deficiencies in the statement of decision is false. Accordingly, we reject appellants' contention that the doctrine of implied findings cannot be applied to resolve deficiencies in the factual findings in the statement of decision.

II. *Background on the Eminent Domain Law and Public Uses on Same Parcel*

California's eminent domain law was enacted by section 2 of chapter 1275 of the Statutes of 1975 and codified as title 7 of part 3 of the Code of Civil Procedure, commencing with section 1230.010. The enactment resulted from a recommendation by the California Law Revision Commission proposing "a new comprehensive statute governing condemnation law and procedure—the Eminent Domain Law." (Recommendation Proposing the Eminent Domain Law (Dec. 1974) 12 Cal. Law Revision Com. Rep. (1974) pp. 1601, 1619.)

The proposal contained some important changes but was basically a reorganization and restatement of prior law with numerous minor technical and corrective changes. (*Ibid.*)

### A. *Condemnation of Property Already Appropriated to Public Use*

The Law Revision Commission addressed many topics, including the condemnation of property already appropriated to public use:

"Existing law permits to a limited extent the acquisition by eminent domain of property already appropriated to public use. The Commission believes, however, that joint use of property appropriated to public use should be encouraged in the interest of the fullest utilization of public land and the least imposition on private ownership. To this end, it recommends that any authorized condemnor be permitted to acquire, for use in common, property already devoted to public use if the joint uses are compatible or can be made compatible without substantial alteration of the preexisting public use.

"Only where the two uses are not compatible and cannot be made compatible should a condemnor be permitted to take for its exclusive use property already appropriated to public use. In such a case, taking of the property should be permitted only for a more necessary public use than the use to which the property is already appropriated." (Recommendation Proposing the Eminent Domain Law (Dec. 1974) 12 Cal. Law Revision Com. Rep., *supra*, at pp. 1637–1638, fns. omitted.)

The situation of compatible public uses and the condemnation procedures that will lead to the joint use of the property is addressed in article 6 of the eminent domain law, which commences with section 1240.510:

"Any person authorized to acquire property for a particular use by eminent domain may exercise the power of eminent domain to acquire for that use property appropriated to public use if the proposed use will not unreasonably interfere with or impair the continuance of the public use as it then exists or may reasonably be expected to exist in the future. Where property is sought to be acquired pursuant to this section, the complaint, and the resolution of necessity if one is required, shall refer specifically to this section."

The situation where a condemner's proposed use will displace the condemnee's existing or planned public use is addressed in article 7 of the eminent domain law, section 1240.610 et seq. Under those statutory provisions, preference is given to the more necessary public use. (See Naiman, *Judicial Balancing of Uses for Public Property: The Paramount Public Use Doctrine* (1990) 17 B.C. Envtl. Aff. L. Rev. 893, 908–911 [arguing that

judicial balancing of competing uses is required by the statutory phrase "more necessary public use"].) Section 1240.610 states:

"Any person authorized to acquire property for a particular use by eminent domain may exercise the power of eminent domain to acquire for that use property appropriated to public use if the use for which the property is sought to be taken is a more necessary public use than the use to which the property is appropriated. Where property is sought to be acquired pursuant to this section, the complaint, and the resolution of necessity if one is required, shall refer specifically to this section."

### B. *General Prerequisites Applicable to All Condemnations*

■ Regardless of whether the property sought to be condemned already is appropriated to a public use or is held for a private use, section 1240.030 specifies some of the prerequisites to condemnation:

"The power of eminent domain may be exercised to acquire property for a proposed project only if all of the following are established: [¶] (a) The public interest and necessity require the project. [¶] (b) The project is planned or located in the manner that will be most compatible with the greatest public good and the least private injury. [¶] (c) The property sought to be acquired is necessary for the project."

These three prerequisites to condemnation have been described as "the public necessity elements." (Legis. Com. com., 19 West's Ann. Code Civ. Proc. (1982 ed.) foll. § 1240.030, pp. 489, 490.)

### III. *Section 1240.030 Was Applied Correctly in This Case*

The referee explicitly found "that the public interest and necessity require this project" and thus concluded the pipeline met the requirements of subdivision (a) of section 1240.030. BNSF does not challenge this finding on appeal. (See *Shell Cal. Pipeline Co. v. City of Compton* (1995) 35 Cal.App.4th 1116 [41 Cal.Rptr.2d 753] [after franchise agreement with city lapsed, public utility pipeline company filed eminent domain proceeding to obtain a subsurface easement for the existing pipeline; finding of public interest and necessity upheld because pipeline reduced price of gasoline provided to public and reduced use of tanker trucks to transport oil products].)

With respect to the requirements in subdivisions (b) and (c) of section 1240.030, the referee explicitly found that (1) the pipelines were not located in the manner that will be most compatible with the greatest public good and

least private injury and (2) "SFPP has failed to establish a legal necessity for taking this particular piece of property." Appellants challenge these findings by asserting that they are based on "(1) an improper and legally irrelevant analysis regarding alternative locations for SFPP's pipeline, and (2) insufficient and speculative evidence regarding the alleged incompatibility of SFPP's existing pipelines and BNSF's proposed second track."

## A. *Evidence Regarding Other Locations Was Relevant*

Appellants contend the referee's analysis of an alternate location was error because it (1) improperly balanced the equities between the parties, (2) did not give effect to the presumption of public necessity applicable to the existing location of the pipeline, and (3) failed to consider the wide discretion given to a condemner in selecting a location. (See *Kachadoorian v. Calwa County Water Dist.* (1979) 96 Cal.App.3d 741, 749 [158 Cal.Rptr. 223] (*Kachadoorian*); *City of Pasadena v. Stimson* (1891) 91 Cal. 238, 255–256 [27 P. 604].)

The question whether the referee properly analyzed possible alternate locations for the pipeline involves (1) an analysis of the language used in subdivision (b) of section 1240.030, and (2) the consideration of the case law and related arguments presented by appellants.

### 1. *Application of the unambiguous language of subdivision (b) of section 1240.030*

■ Our analysis of whether the referee was authorized by subdivision (b) of section 1240.030 to consider the availability of alternative locations for SFPP's pipeline begins with the statute itself. We must ascertain the intent of the Legislature so as to effectuate the purpose of section 1240.030, subdivision (b). (See *Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].)

■ First, in construing the meaning of that statutory provision, we must look to the words used by the Legislature, giving them their usual, ordinary meaning.[8] (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906].) The words "most," "greatest" and "least" are comparative terms that relate to both the plans and the location of the project. Such

---

[8] Appellants did not present an explicit analysis of the language in section 1240.030, subdivision (b) despite the following inquiry in our request for supplemental briefing: "(4.B) As a matter of statutory construction, explain how the comparative terms 'most,' 'greatest' and 'least' (can/cannot) be applied to a project's location without matching that location up against other locations?" In their supplemental brief, appellants chose to ignore this specific question. (See also fn. 9, *post.*)

comparative terms cannot be applied in the abstract; instead, they unambiguously show the Legislature's intent that the condemner's proposed location be compared with other potential locations to see how those other locations compare in effect on the public good and private injury resulting from the project.

██ Generally, the analysis of statutory language ends once a court has determined that the words used are clear and unambiguous. (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775 [72 Cal.Rptr.2d 624, 952 P.2d 641] [judicial construction is generally unnecessary where statutory language is clear and unambiguous, i.e., has only one reasonable construction].) Nevertheless, it is not uncommon for a court to review legislative history, which is another source for the expression of legislative intent, to confirm its statutory analysis. (E.g., *In re Vicki H.* (1979) 99 Cal.App.3d 484, 494 [160 Cal.Rptr. 294] [Fifth App. Dist. observed that its statutory analysis was supported by legislative comment]; see *North Hollywood Project Area Com. v. City of Los Angeles* (1998) 61 Cal.App.4th 719, 723 [71 Cal.Rptr.2d 675] [Second App. Dist., Div. Two].)

In this case, the clarity with which the Legislature expressed itself is supported by readily available legislative history regarding subdivision (b) of section 1240.030. The 1975 Senate Legislative Committee comment appended to section 1240.030 provides in part:

"Subdivision (b). Subdivision (b) prevents the taking of property by eminent domain unless the proposed project is planned or located in the manner that will be most compatible with the greatest public good and the least private injury. This limitation, which involves essentially a comparison between two or more sites, has also been described as 'the necessity for adopting a particular plan' for a given public improvement. People v. Chevalier, 52 Cal.2d 299, 307, 340 P.2d 598, 603 (1959). See also City of Pasadena v. Stimson, supra[, 91 Cal. 238]; Eel R. & E. R.R. v. Field, 67 Cal. 429, 7 P. 814 (1885).

"Proper location is based on two factors: public good and private injury. Accordingly, the condemnor's choice is correct or proper unless another site would involve an equal or greater public good and a lesser private injury. A lesser public good can never be counter-balanced by a lesser private injury to equal a more proper location. See Montebello etc. School Dist. v. Keay, 55 Cal.App.2d 839, 131 P.2d 384 (1942). Nor can equal public good and equal private injury combine to make the condemnor's choice an improper location. California Cent. Ry. v. Hooper, 76 Cal. 404, 412–413, 18 P. 599, 603 (1888)."

(Legis. Com. com., 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1240.030, p. 490.)[9]

▮▮▮ Accordingly, we hold that subdivision (b) of section 1240.030 permitted the referee to consider other locations when determining whether the project was located in the proper manner. Thus, the analysis used by the referee to apply subdivision (b) of section 1240.030 to the facts of this case does not contain legal error.

### 2. *The case law relied upon by appellants does not apply to subdivision (b) of section 1240.030*

Appellants arguments were based on case law rather than an analysis of the language used in subdivision (b) of section 1240.030. Therefore, we consider whether the case law compels a result different than the one reached through statutory analysis.

In *Kachadoorian*, a municipal utility operated a water line on land that had been a public alley. After the county abandoned the alley, the owner of the land brought a quiet title action seeking to enjoin the utility from asserting any interest in the land. On the question of whether the water line of the utility was trespassing on the landowner's property, the court held that full title had reverted to the landowner as a result of the county's abandonment and therefore a trespass was occurring. (*Kachadoorian, supra,* 96 Cal.App.3d at p. 747.) Next, the court considered what remedy was available to the landowner and held the trial court erred in quieting title and enjoining the utility's use of the land. (*Id.* at p. 750.) The court ruled the proper form of relief was damages based on inverse condemnation, provided that the utility could establish a public use and the necessity of maintaining that use. (*Id.* at p. 747.)

In holding that the utility had made a sufficient showing regarding public use and necessity, the court held the trial court committed legal error by balancing the equities and determining that the owner's property right outweighed the utility's public service right. (*Kachadoorian, supra,* 96 Cal.App.3d at p. 747.) In addition, the court stated that the requirement concerning the necessity of the property for the project merely required the land be reasonably suitable and useful for the improvement. (*Id.* at p. 749.) The citations used to support this statement, which included a reference to a

---

[9] Despite the ease with which this legislative comment can be found and the specific citation to the related Law Revision Commission Report in our request for supplemental briefing, appellants' supplemental brief included the representation that "SFPP is unaware of any . . . legislative history or comment . . . that construes or applies one or more of the terms 'most compatible,' 'greatest public good' and 'least private injury' contained in subdivision (b) of section 1240.030 . . . ."

Legislative Committee comment,[10] clearly establish that this determination relates to the requirement in subdivision (c) of section 1240.030 that the "property sought to be acquired is necessary for the project." Furthermore, the court stated that "the absence of a substantial public use . . . is not established merely by showing the existence of other physical alternatives to the use of a landowner's property . . . ." (*Kachadoorian, supra*, at p. 749.) The court then adopted a presumption of public necessity for continued use of the land based on the 50 years the pipeline had been in existence and concluded the evidence presented did not overcome that presumption. (*Id.* at pp. 749–750.) Accordingly, the court ruled the pipeline could remain where it was and the landowner was relegated to obtaining damages for the taking of his property. (*Id.* at p. 750.)

*Kachadoorian* is distinguishable from the present case because, among other things, (1) the trial court in *Kachadoorian* did not make any findings of fact regarding the requirements of subdivision (b) of section 1240.030;[11] (2) the issues regarding the greatest public good and the least private injury were not addressed on appeal; and (3) the decision did not mention any facts that suggested any public good resulting from the landowner's use of the property would be adversely affected by continuing to operate the pipeline at that location. Furthermore, the present case involved more than a mere showing of an alternative to the easement requested by SFPP because BNSF made a showing of a *better* alternative.

 The presumption adopted in *Kachadoorian* regarding the necessity of continuing the use of the pipeline[12] might support the referee's finding under subdivision (a) of section 1240.030 "that the public interest and necessity require this project." Nevertheless, *Kachadoorian* is not authority for the proposition that such a presumption is required when considering the issues

---

[10] The Legislative Committee comment provides that the aspect of necessity addressed in subdivision (c) of section 1240.030 "includes the suitability and usefulness of the property for the public use. See City of Hawthorne v. Peebles, 166 Cal.App.2d 758, 763, 333 P.2d 442, 445 (1959) ('necessity does not signify impossibility of constructing the improvement . . . without taking the land in question, but merely requires that the land be reasonably suitable and useful for the improvement'). Accord, Rialto Irr. Dist. v. Brandon, 103 Cal. 384, 37 P. 484 (1894). Thus, evidence on the aspect of necessity covered by subdivision (c) is limited to evidence showing whether the particular property will be suitable and desirable for the construction and use of the proposed public project." (Legis. Com. com., 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1240.030, p. 491.)

[11] Similarly, *Shell Cal. Pipeline Co. v. City of Compton, supra*, 35 Cal.App.4th 1116, the other preexisting pipeline case, did not address the requirements of subdivision (b) of section 1240.030.

[12] Unlike the public utility in *Kachadoorian*, SFPP is not a public entity with a governing body that could have adopted a resolution of necessity. (See §§ 1245.210, 1245.220 & 1245.230.) Thus, the presumption adopted in *Kachadoorian* might be limited to cases where the condemner has the authority to adopt a resolution of necessity.

of the greatest public good and least private injury that arise under subdivision (b) of section 1240.030. Insofar as we are aware, no appellate court has extended the use of such a presumption to the analysis of whether the "project is planned or located in the manner . . . most compatible with the greatest public good and the least private injury" (*ibid.*). We will not be the first to do so. There is nothing in the statutory language or legislative history to suggest that such a presumption was intended by the Legislature or furthers the purpose of the statute, i.e., the efficient utilization of land. We, therefore, hold that a finder of fact inquiring into greatest public good and least private injury should consider all the facts and circumstances, and the preexisting location of an improvement is only one of the factors relevant to that inquiry.

Appellants also argue that consideration of alternate locations is inappropriate because of the ease with which condemnation proceedings could be thwarted by showing other locations are "just as good." (*City of Pasadena v. Stimson, supra,* 91 Cal. at p. 256.) This argument misses the mark in this case because the standard applied by the referee was not whether an alternate location west of the existing track was just as good, but whether that alternate location was better, i.e., was "compatible with the greatest public good and the least private injury." (§ 1240.030, subd. (b).)

In summary, we hold the principles of law contained in the cases relied upon by appellants did not prohibit the referee from evaluating alternate locations when applying subdivision (b) of section 1240.030 to the facts of this case.

### B. *Analysis of Offer of Alternate Location Was Not Prejudicial Error*

Because of the clarity of the statutory language in subdivision (b) of section 1240.030 and its legislative history, the referee's decision can be upheld without considering the requirement in subdivision (c) of section 1240.030. Thus, we need not discuss appellants' attacks on the referee's analysis of the necessity requirement contained in that provision.

Nevertheless, to avoid a misunderstanding as to the future legal significance of the judgment and the statement of decision, we specifically address appellants' argument relating to the following paragraph from the statement of decision:

"The [referee] cautions, however, that the decision as to SFPP's right to an easement, as requested in the Complaint, rested in large part upon BNSF's ongoing offer of an alternate location for the pipeline. Should BNSF renege on this offer, the Court would be justified in revisiting the issue of necessity."

Based on this paragraph, appellants contend that the referee committed legal error by considering BNSF's purported offer of an alternate location. Our analysis begins by placing the quoted paragraph from the statement of decision in context. First, the paragraph is contained in the referee's discussion of BNSF's cross-complaint for declaratory relief of its rights under the license agreement. Second, the referee's earlier discussion of whether the property was necessary for the project stated:

"Here the evidence is that BNSF has continually offered, to and through the time of trial, an easement on the other side of the right of way which would be compatible with the proposed second railroad track at this location. The fact that no agreement was reached as to the specific location of such an alternate easement is due to SFPP's refusal to consider such an option. . . . In *Shell Oil v. Compton, supra,* the Court found necessity in part because the City failed to suggest an alternate location for the pipeline; here several alternatives have been suggested. The [referee] finds that SFPP has failed to establish a legal necessity for taking this particular piece of property."

Third, as support for the finding that the proposed easement was not located in the manner most compatible with the greatest public good, the referee stated, "[a]s found above, BNSF has continually offered an alternate location which would satisfy SFPP's need for its pipeline distribution system while allowing BNSF to operate its proposed second track continuously."

Appellants argue that the purported offer of an alternate location should not have been considered because the offer had not resulted in an agreement and the lack of specific terms in the unwritten statements made by BNSF did not constitute an "offer" for purposes of the law governing contract formation. (See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 128, pp. 153–154 [general nature and effect of an offer].)

 Viewing the decision in the light most favorable to BNSF, we reject appellants' argument that the referee's discussion of the availability of an alternate location for the pipeline constitutes prejudicial legal error. The existence or nonexistence of a sufficiently definite offer, i.e., an offer that could be accepted to form an enforceable contract, is not a criterion contained in subdivision (b) of section 1240.030. Thus, the absence of a binding offer has no impact on the referee's determination that the prerequisite to condemnation contained in that subdivision was not met. Rather, the legally relevant aspect of the discussion is the alternate location itself—not the offer—because the available[13] alternate location allows for the achievement of

---

[13] Appellants' argument that they will be placed in an untenable position if they must move the pipeline is not compelling because that position is the result of SFPP's tactical choice in this action not to seek the condemnation of an alternate location in the event its first choice

greater public good[14] in comparison to the location of the easement sought by SFPP.

Also, the referee's statement about revisiting the issue of necessity could mean that if the parties are not able to negotiate an agreement that allows the pipeline to be moved to the west side of the right-of-way, then SFPP would be justified in filing another action to condemn an easement on the west side of the right-of-way. The failure of the parties to reach an agreement on a new location for the pipeline could not retroactively convert its present location into the location that is "most compatible with the greatest public good and the least private injury" (§ 1240.030, subd. (b)) for the long term. Thus, the referee's use of the term "revisiting" must allude to a subsequent lawsuit and informs the parties that the decision and judgment rendered in this action is sufficiently narrow so as not to bar a subsequent action seeking to condemn a different five-foot easement on the west side of the right-of-way.[15]

Finally, the relief requested in the prayer of SFPP's complaint included "such other and further relief as the court may deem proper." The possibility that the parties could reach an agreement as to the alternate location for the pipeline on the west side of the right-of-way might have caused the referee to determine that it was not appropriate at that point in time to use that broad language in the request for relief as a basis for condemning an easement in an alternate location of the right-of-way.[16]

 Consequently, the referee's discussion of the purported offer from BNSF does not undermine the determination that SFPP failed to establish the

was denied. In other words, the alternative location appears to be available to SFPP through a second condemnation action that would not have been necessary had SFPP structured its request for relief in this action more broadly.

[14] In this case, the public good takes the form of less risk and more efficient performance of the rail system. The public benefits from an efficient rail system include greater use of the public transportation provided by AMTRAK and the related benefits of reduced automobile traffic, which include less congested traffic and less air pollution from automobile exhaust. (See generally Pub. Resources Code, § 25481 [legislative findings regarding the public interest in the reduction of traffic and pollution].)

[15] The referee might have used somewhat ambiguous language in discussing the purported offer as part of warning BNSF against attempting to exercise its right under the license agreement to remove the pipeline. If BNSF attempted to remove the pipeline without relocating it and SFPP sought to temporarily enjoin that removal *only until an appropriate alternate location could be finalized*, the reference to revisiting the issue of "necessity" could mean that the court considering whether to grant temporary injunctive relief might decide that the current location of the pipeline is the location most compatible with the greatest public good and the least private injury only until a better location is identified and SFPP's rights to that location are definitively resolved, either by agreement or a judgment obtained in an eminent domain proceeding.

[16] Because it was not raised by the parties, we do not address the question when it would be appropriate for a court to enter a judgment condemning a property interest in a location on the condemnee's land different than the one requested by the condemner.

prerequisite to condemnation set forth in subdivision (b) of section 1240.030 or otherwise constitute reversible legal error.

## C. *Substantial Evidence Supports the Referee's Findings*

In applying section 1240.030 to the facts of this case, the referee determined "that SFPP's proposed location of the easement is not located in the manner most compatible with the greatest public good. (See also the following discussion of CCP 1240.510.)" The referee's determination was based in part on explicit findings that (1) maintenance and repair work on the pipeline "would affect BNSF's on-time performance, having a domino effect on all trains in the Bakersfield to Port Chicago corridor" and (2) "the use of the pipeline in its current location would substantially or materially affect BNSF's efficient use of its proposed second track." In reiterating these findings, the referee stated "that the pipeline in its current location both interferes with BNSF's proposed second track and poses a safety issue, at least as to the operation of the railroad."

Appellants challenge these findings of fact and assert that substantial evidence demonstrates that the pipeline will not unreasonably interfere with or impair BNSF's use of the property it seeks to condemn. Appellants assert that "the *substantial evidence* presented at trial clearly establishes that" the proximity between the proposed second track and its existing pipeline (1) does not pose any legitimate risk to the pipeline, (2) does not pose any legitimate public safety concerns, (3) will not prohibit or impede necessary pipeline maintenance or repair, and (4) will not affect adversely the railroad's efficiency or on-time performance. With respect to risk and safety, appellants assert that the stress or load that will be placed on the pipelines by the proposed second track falls within the applicable limitations, the risk of damage to the pipeline from derailment of a train is so small it is not a legitimate concern, and the construction and maintenance of the proposed track can be accomplished in a manner that does not pose a discernable risk to the pipeline.

First, appellants' phrasing of their contentions regarding substantial evidence shows they have turned that standard on its head. The question is not whether appellants can show that substantial evidence supports their factual assertions, but whether appellants have shown that the appellate record lacks any substantial evidence, contradicted or uncontradicted, to support the referee's findings of fact. (*Crawford v. Southern Pacific Co., supra*, 3 Cal.2d at p. 429.) It is possible for each side to present substantial evidence in support of its position; thus, appellants' reference to "the" substantial evidence presented at trial wrongly implies that there can be only one body of evidence that is weighty enough to be regarded as substantial.

Second, in conjunction with its flawed presentation of the substantial evidence standard, appellants have failed to establish that the record does not contain substantial evidence supporting the referee's express and implied findings of fact. It is apparent from the statement of decision that the referee gave greater weight to the testimony of John Fleming, a manager of engineering for BNSF, and Jimmie Powers, the manager of pipelines and terminals for Parsons Transportation Group, and gave lesser weight to the testimony presented on behalf of appellants. For example, the statement of decision addressed an issue affecting the safety of the railroad as follows:

"Mr. Powers testified that he was concerned that a small leak from the pipeline might spread under the railroad tracks, making the tracks less stable and possibly causing sparking should it rise to the surface."

In addition, the referee discussed the interference the pipeline would cause the second track:

"John Fleming testified that in order to construct the second track, new sub-shoring would need to be installed to support the track; if the pipeline remained in its current location, it would interfere with this sub-shoring. If not moved, the pipeline would be permanently located in the embankment of the second track, causing both problems with the construction of the second track and problems with maintenance of both the tracks and the pipeline. In terms of maintenance of the tracks, maintenance machines would have to use the right-of-way and the embankment to work on the track, thus interfering with and possibly damaging the pipeline."

██ We hold that the testimony of John Fleming, Jimmie Powers and the report of Parsons Transportation Group are part of the substantial evidence in the record that supports the referee's finding that the proposed easement was not located in the manner most compatible with the greatest public good. Thus, SFPP failed to establish the prerequisite to its exercise of the power of eminent domain set forth in subdivision (b) of section 1240.030 and may not condemn the easement sought in its complaint.

## IV. *The Referee Did Not Err Regarding the Reasonableness of the Interference*

Appellants claim the statement of decision shows the referee committed a clear error of law when it stated that "[u]nder CCP section 1240.510, SFPP must establish that its proposed use of the pipeline in its current location will not interfere with or impair the continuance of BNSF's use as it currently exists or may reasonably be expected to exist in the future." Appellants assert they only were required to show that the pipeline would not *unreasonably* interfere with or impair the use of the proposed second track.

After reviewing the statement of decision, we conclude that (1) the referee was aware that section 1240.510 contained a reasonableness standard and (2) the referee impliedly found that the pipeline's interference with the proposed second track was unreasonable.

First, the referee stated "the Court finds that CCP 1240.510 is the relevant statute and that SFPP is required to prove that the proposed use will not *unreasonably* interfere with or impair the continuance of the use of the right-of-way for railway transportation as it currently exists or may reasonably be expected to exist in the future." (Italics added.) This language establishes that the referee was aware that section 1240.510 contained a reasonableness standard. Given this explicit statement of the correct legal standard, we cannot presume legal error in the subsequent application of section 1240.510.

Second, under the doctrine of implied findings, we are required by law to infer that the referee found the interference was unreasonable. (See pt. I.B., *ante*.) This implied finding is supported by substantial evidence—the same evidence that supports the referee's finding that the current location of the pipeline was not compatible with the greatest public good and the least private injury. (See pt. III.C., *ante*.)

## V. *Referee's Determination of Value Is Dictum, Not Reversible Error*

In light of our prior holdings, the determination by the referee of the value of the property that SFPP sought to condemn is dictum and, therefore, cannot constitute reversible error. Consequently, we need not consider appellants' claim that the determination of value is not supported by substantial evidence.

### DISPOSITION

The judgment is affirmed. Respondent BNSF shall recover costs on appeal.

Vartabedian, Acting P. J., and Cornell, J., concurred.