Filed 1/29/24  Wang v. McKeirnan CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JIMMY WANG,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>ROBERT McKEIRNAN,<br><br>    Defendant and Respondent. | B324442<br><br>Los Angeles County<br>Super. Ct. No. 21STCP03084 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert S. Draper, Judge.  Affirmed.

Law Office of Michael DesJardins and Michael DesJardins for Plaintiff and Appellant.

Cepkinian-Cinar Law and Jibit Cinar for Defendant and Respondent.

———————————

The Labor Commissioner awarded Robert McKeirnan $41,013.47 against Jimmy Wang, the Chief Financial Officer (CFO) of McKeirnan's former employer. Wang appealed the decision to the superior court. After conducting a trial de novo, the court found Wang refused to pay McKeirnan's wages using the proceeds from the sale of a company asset that McKeirnan had arranged. Based on that finding, the court concluded Wang was personally liable for McKeirnan's unpaid wages under Labor Code section 558.1, and it affirmed the Labor Commissioner's award. On appeal, Wang contends the court's decision is not supported by substantial evidence. We disagree and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. ***The Labor Commissioner's decision***

McKeirnan filed a complaint with the Labor Commissioner against his former employer and its CFO, Jimmy Wang. The Labor Commissioner held a hearing and awarded McKeirnan $169,982.80. Of that amount, the Labor Commissioner determined Wang was personally liable for $41,013.47. The award against Wang consisted of $12,408 in unpaid wages under Labor Code section 1194, $26,538.60 in waiting time penalties under Labor Code section 203, and $2,066.87 in interest under Labor Code section 98.1.

2. ***Wang appeals to the superior court***

Wang appealed the Labor Commissioner's decision to the superior court. The court held a two-day trial de novo, at which McKeirnan presented evidence showing the following:

McKeirnan's former employer, HK Battery Technology, Inc. (HK Battery), was a subsidiary of Hybrid Kinetic Group, LTD (HK Group). HK Group was in the business of designing,

2

manufacturing, and selling cars. Benjamin Yeung was the largest shareholder of HK Group and the chairman of its board. He also was the CEO of American Compass, Inc. (American Compass), another subsidiary of HK Group. Benjamin's son, Carter Yeung, was the CEO of a different subsidiary and acted as a "conduit" for his father throughout the various HK Group companies.[1]

Wang was the CFO of HK Battery and American Compass. As HK Battery's CFO, he was involved in the day-to-day financial operations of the company. Among other things, he was responsible for processing payroll, paying invoices, and reimbursing business expenses. To cover payroll expenses, Wang would transfer funds from American Compass to HK Battery. He would then instruct a third-party payroll company to issue paychecks to HK Battery employees. Wang also had access to HK Battery's bank accounts and had the authority to write checks on its behalf for up to $100,000.

HK Battery hired McKeirnan to lead an engineering team in its micro-turbine unit. While working in that position, McKeirnan arranged the purchase of a research vehicle—called the Blackbird—for his team to use to develop an extended-range electric vehicle. American Compass—or possibly a different HK Group subsidiary—bought the Blackbird from Richard Hillman for $70,000. As a condition of the sale, Hillman had the right to repurchase the car if it was put up for sale in the future. After the sale, the car was registered to American Compass.

HK Battery and American Compass ran into financial troubles in early 2019 and stopped paying their employees.

---

[1] We occasionally refer to Benjamin Yeung and Carter Yeung by their first names to avoid confusion.

HK Battery's CEO, Jason Xu, told McKeirnan the company was seeking new investors, and he assured McKeirnan a new source of funding was imminent. In the meantime, HK Group's chairman, Benjamin Yeung, decided to use company cars to help cover payroll expenses. Employees with company cars were given the option to keep or sell their cars, with the value being credited against any unpaid wages.

Around this time, McKeirnan came up with a plan to sell the Blackbird to help cover payroll for himself and his team. McKeirnan shared the plan with Brandon Keenan. Keenan worked for a different subsidiary of HK Group, and he was Carter Yeung's assistant, best friend, and roommate.

Keenan and Carter Yeung discussed McKeirnan's plan over text messages. In one message, Carter said his father, Benjamin Yeung, had "given the ok" and wanted Keenan to talk to Wang about the plan. Carter clarified the plan was to "[s]ell the car and distribute funds to team for time being." Keenan could not recall whether he had that conversation with Wang, but he said it was likely because he would not disobey a direction from Carter.

According to Wang, Keenan asked him for the title to the Blackbird so McKeirnan could sell it. Wang "felt [McKeirnan's] project did not [need] to use" the Blackbird anymore, so he gave the title to Keenan. Wang said he personally made the decision to sign over the title to Keenan; no one had instructed him to do so.

McKeirnan apparently spoke to Hillman, who agreed to repurchase the Blackbird on the condition that the funds be used to cover HK Battery's payroll expenses. Hillman wrote

a $70,000 check made out to American Compass, which he gave to McKeirnan.

At some point, Wang asked Keenan for Hillman's check. Keenan said McKeirnan had the check and wanted the proceeds to go to his team. Wang responded that it was "not a good idea" because it would be unfair and illegal to distribute the funds only to McKeirnan's team. Keenan told Wang it was "out of my hands on what to use [the check] for."

Around this time, Keenan sent McKeirnan a text message relaying a conversation he had with Carter Yeung. Kennan said Yeung had "told me to call Jimmy [Wang] today to talk to him about the check as it's already been communicated to him per the chairman." Keenan could not recall whether he ended up having that conversation with Wang, but he noted he had no reason to disobey Carter's instruction.

In October 2019, McKeirnan and Keenan drafted a document called the "Blackbird Terms of Resale," which the court entered into evidence without objection. McKeirnan and Keenan created the document so HK Battery's executive team could confirm and validate the terms of the sale to Hillman. They also wanted to document the reason the funds had not been used for payroll.

The document states, "Approval was received to sell the [Blackbird] and it was agreed that the proceeds would be applied to aid the team's payroll compensation." Hillman "agreed he would purchase the [Blackbird] under the condition that all of the funds from the sale were to be used to aid the team's payroll." However, "[t]he funds, per the instruction of Jimmy Wang (CFO), cannot be used legally to selectively compensate individual team members as per the payroll structure of HK [Battery]."

5

To resolve this issue, the document proposed that McKeirnan's team receive discretionary bonuses totaling the sale price. The document offered to relinquish the funds from the sale if someone with the requisite authority agreed to use the funds in that manner.

Keenan gave the document to Carter Yeung, who reportedly gave it to Wang. According to Keenan, Wang could have signed the agreement.

At some point, McKeirnan gave Hillman's check to Keenan. Keenan testified that McKeirnan would have given Wang the check if Wang had agreed to give the funds to McKeirnan's team. However, Wang apparently never agreed, so Keenan and McKeirnan never turned over the check.

### 3. *The court affirms the Labor Commissioner's award*

The court issued a statement of decision affirming the Labor Commissioner's award. The court found Wang was the CFO of HK Battery and actively involved in its day-to-day financial operations. It also found Wang was aware Benjamin Yeung and Carter Yeung had approved the plan to use the Blackbird funds to pay McKeirnan's wages. The court noted that if Wang had doubts about the approvals, he could have contacted Benjamin Yeung and Carter Yeung for verification. Instead, Wang unilaterally decided the funds could not be used for payroll. The court concluded Wang's decision caused a violation of the Labor Code, for which he is personally liable to McKeirnan under Labor Code section 558.1. Accordingly, the court denied Wang's appeal and entered judgment for McKeirnan.

Wang timely appealed.

# DISCUSSION

Wang's sole argument on appeal is that there is insufficient evidentiary support for the trial court's determination that he is liable under Labor Code section 558.1.

We review a trial court's factual findings in its statement of decision—both express and implied—for substantial evidence. (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462.) "Where [the] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358; *Estate of Young* (2008) 160 Cal.App.4th 62, 75–76.) We must " 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]' [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment." (*Estate of Young*, at p. 76.)

Under Labor Code section 558.1, "[a]ny employer or other person acting on behalf of an employer, who violates, or causes to be violated, any provision regulating minimum wages or hours and days of work in any order of the Industrial Welfare Commission, or violates, or causes to be violated, Sections 203, 226, 226.7, 1193.6, 1194, or 2802, may be held liable as the employer for such violation." (Lab. Code, § 558.1, subd. (a).) For purposes of section 558.1, persons " 'acting on behalf of an employer' " are limited to owners, directors, officers, and managing agents of the employer. (*Id*., subd. (b).) Absent

7

personal involvement in a Labor Code violation, to be liable under section 558.1, a person must have "had sufficient participation in the activities of the employer, including, for example, over those responsible for the alleged wage and hour violations, such that the [person] may be deemed to have contributed to, and thus for purposes of this statute, 'cause[d]' a violation." (*Usher v. White* (2021) 64 Cal.App.5th 883, 896–897.)

Here, the trial court determined Wang is personally liable under Labor Code section 558.1 because, as the CFO of HK Battery, he unilaterally prevented the proceeds from the sale of the Blackbird from being used to pay McKeirnan's wages. Wang does not meaningfully challenge the theory of liability underlying the court's decision. To the contrary, he seems to concede he would be personally liable to McKeirnan under Labor Code section 558.1 had he prevented McKeirnan from receiving the proceeds from the sale of the Blackbird. Nor does Wang challenge the Labor Commissioner's determination—which the trial court implicitly adopted— that McKeirnan is entitled to unpaid wages, penalties, and interest under Labor Code sections 98.1, 203, and 1194.

Nevertheless, Wang contends the trial court erred because there is no evidence that one of his superiors—such as Carter Yeung or Benjamin Yeung—instructed him to pay McKeirnan's wages using the funds from the Blackbird sale. The trial court rejected Wang's contention, and rightly so. McKeirnan submitted a text message in which Carter Yeung explicitly instructed Keenan to talk to Wang about McKeirnan's plan to sell the Blackbird. Keenan asked Yeung to clarify what he should say to Wang, and Yeung told him plainly: "Sell the car and distribute

funds to [McKeirnan's] team for [the] time being." Although Keenan could not recall whether he had that conversation with Wang, he believed he likely did because he would not "directly disobey something that Carter told me to do."

The record also contains evidence indicating Wang discussed McKeirnan's plan with Benjamin Yeung, who was the chairman of HK Group and the CEO of American Compass, which owned the Blackbird. McKeirnan introduced a text message in which Keenan said he had been instructed to "call [Wang] today to talk to him about the check [from the sale of the Blackbird] as it's already been communicated to him per the chairman." It is reasonable to interpret this to mean that, at the time Keenan sent the message, Wang and Benjamin Yeung had already discussed McKeirnan's plan to use the proceeds from the sale of the Blackbird for payroll. Wang did not object to this evidence on hearsay grounds, so the trial court was free to consider it for the truth of the matters asserted.

Even if the text messages were inadmissible hearsay or otherwise insufficient, Wang acknowledged discussing the Blackbird sale with Keenan, including the fact that McKeirnan wanted the proceeds to be used for payroll. Given Keenan was Carter's assistant, it is reasonable to infer he told Wang that Carter had approved the plan. Moreover, because Carter was known as the "conduit" for his father throughout HK Group and its subsidiaries, it is reasonable to infer Wang understood that Benjamin Yeung had approved the plan as well. To the extent Wang remained uncertain, as the trial court aptly noted, he easily could have contacted Carter Yeung or Benjamin Yeung to verify that they had authorized the plan. Viewing this evidence in the light most favorable to the judgment, the

trial court reasonably could have found Wang had been instructed to use the proceeds from the sale of the Blackbird to pay McKeirnan's wages, but he unilaterally refused to do so.

Wang alternatively contends that, even if he had been instructed to use the funds to pay McKeirnan's wages, he is not personally liable because he never received the check from the sale. Once again, we disagree. Although McKeirnan conceded he did not give Wang the check from the sale, the trial court reasonably could have found that fact was not dispositive. Wang does not dispute that McKeirnan received the requisite approval to use the sale proceeds to pay his wages. Moreover, Keenan testified that McKeirnan would have given the check to Wang had he agreed to use the funds for payroll. Wang refused, so McKeirnan declined to give up the check. Under these circumstances, the court reasonably could have found McKeirnan was justified in conditionally refusing to turn over the check.

Finally, Wang contends he is not personally liable for McKeirnan's unpaid wages because there is no evidence he had authority over HK Battery's employment decisions, possessed the power to raise funds for the company, or persuaded McKeirnan to work without pay. While all that may be true, it is beside the point, as the trial court did not base its decision on any of those issues. Instead, the court found Wang is personally liable because he refused to use the proceeds from the Blackbird sale to pay McKeirnan's wages. For the reasons already discussed, substantial evidence supports that finding.

10

## DISPOSITION

We affirm the judgment.  Robert McKeirnan is awarded his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:


LAVIN, Acting P. J.


ADAMS, J.

11