Filed 6/22/23  In re Jada B. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
## DIVISION THREE

| | |
|---|---|
| In re Jada B., a Person Coming Under the Juvenile Court Law. | B315007 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMES T.,<br><br>    Objector and Appellant. | Los Angeles County Super. Ct. No. 21CCJP01473 |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen C. Marpet, Judge Pro Tempore. Affirmed.

California Appellate Project and Vincent Uberti, under appointment by the Court of Appeal, for Objector and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

James T. challenges the juvenile court's denial of his request for presumed father status over the minor, Jada B., under Family Code[1] section 7611. James met Dominique B. (mother) when she was three months pregnant with Jada. Mother and Jada lived with James for approximately a year after Jada was born. The child was declared a dependent of the juvenile court after mother left her with James without making an appropriate plan for the child's ongoing care and supervision. James applied for presumed father status, which the court denied.

James contends he met the criteria of section 7611, subdivision (d), and that the court erred in denying his request. Viewing all evidentiary conflicts and drawing all reasonable inferences in support of the order, as we must, we conclude that substantial evidence supports the court's finding that James was not a presumed father. We therefore affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

In March 2021, mother called the Los Angeles County Department of Children and Family Services (the Department) and stated that she no longer wanted her baby, who was then one year old, because her boyfriend broke up with her. She stated that she was homeless and unable to care for the child and that she had left the child with her ex-boyfriend, James, two days prior. James was not the father of her child. The identity of the father was unknown. Mother also claimed she has bipolar

---

[1] All undesignated statutory references are to the Family Code.

2

disorder and schizophrenia. Although mother reported that she had called from a pay phone, when a social worker called the number back, a man named "K-Dog" answered.

A social worker went to James' home and spoke with James and two of his sisters. His sister Brandy informed the social worker that mother had stated that she was going to meet with them to complete the paperwork for guardianship of Jada. Brandy stated that she and James had been taking care of Jada since she was a baby and that mother left Jada to get high on crystal meth and to prostitute. Brandy reported that "K-Dog" was mother's pimp.

The social worker informed them that mother had given temporary custody of Jada to the Department and that she therefore had to take custody of the child. James was very emotional about Jada leaving. He stated that he had been caring for Jada since she was born and provided for her needs. However, he was not present at her birth and did not sign her birth certificate. James was too emotional to continue the interview. Brandy informed the social worker that Jada had not received any shots or been to a doctor because mother had not obtained Jada's birth certificate or social security card.

The social worker took Jada for a medical examination, where it was revealed that she had a healing diaper rash. She was otherwise medically cleared. The social worker observed that Jada was a happy baby. She was "smiling, babble talking, pointing, walking, throwing things then laughing and able to drink and chew food." She appeared healthy and was developing appropriately for her age.

The social worker later called Brandy to speak with James. James was not present, but Brandy stated that James met

mother when mother was three months pregnant with Jada. She claimed that mother did not want to deal with Jada because she cried too much and would wake up James at night to feed Jada when she cried. Brandy said that James did an amazing job with Jada, built a relationship with her, and is her father. She also mentioned that James has two other children who live in Las Vegas and whose mother never allows James to see the children.

On March 30, 2021, the Department filed a Welfare and Institutions Code section 300 petition on Jada's behalf alleging that mother left the child in the care of her male companion without making an appropriate plan for the child's ongoing care and supervision; mother's whereabouts were unknown to the male companion; and such failure to make an appropriate plan for the child's care and supervision by the mother endangers the child's physical health and safety and places the child at risk of serious physical harm and damage.

Prior to the detention hearing, the social worker received a call from mother. Mother stated that she wanted Jada placed with mother's former foster mother. The social worker asked mother why she gave custody of Jada to the Department. Mother began to cry and stated that James had made her. He told her that she had to because he only wanted to be with mother. She further claimed that he tried to blackmail her by saying that if she did not do it, he would not give her any of her clothes. Mother claimed that James did not know how to care for Jada. He would not give the child milk and would tell mother to give her water. Mother stated that she did not want Jada back because she was "tired of them threatening [her]," referring to James and his two sisters.

4

Mother admitted that she is bipolar and is not currently on medication but denied that she had schizophrenia. She stated that she experienced domestic violence with James and that James would hit her in front of Jada and that his sisters would not help her. Mother stated that she did not discipline Jada because she was too young, but that James would pick Jada up by her onesie and slam her on the bed when the child was crying.

Prior to the detention hearing, James filed a Judicial Council form JV–505: Statement Regarding Parentage. In it, he stated that he believed himself to be the child's parent and requested that the court enter a judgment of parentage. He stated that Jada had lived with him from April 2020 to March 2021, that he had told "everyone I know" that Jada was his child, and that he had participated in her daily care for a year, provided "regular and consistent financial support," and that Jada had spent "frequent and regular" time with his family.

At the detention hearing, the court found that a prima facie case existed and ordered the child removed from the care, custody, and control of mother. The Department asked the court for an opportunity to interview mother further before a determination was made as to whether James was the presumed father. The court agreed to defer the paternity ruling and instructed that James be given notice of the adjudication hearing.

In May 2021, the Department filed an amended petition, in which the Department added allegations that mother has a history of illicit drug abuse, is a current user of marijuana and methamphetamine, and is therefore incapable of providing regular care for the child. It further alleged that mother has mental and emotional problems, including a diagnosis of bipolar

5

disorder and schizophrenia for which she failed to participate in treatment or receive medications.

In its jurisdiction/disposition report, the Department reported that Jada's caregiver expressed concerns regarding her development, behavior, and care prior to her placement. She believed that the child had been molested due to certain behaviors, including reaching for and grabbing others' genitals, pushing the heads of others towards her own genital area, thrusting her hips and grunting, and trying to suck and lick the fingers of adults. The caregiver also stated that when Jada was first placed in her home, she was only crawling. The caregiver worked with her on standing and taking steps and she was now walking with confidence. The child was very quiet upon her placement but now mimicked words and phrases. Although Jada had made good progress, she was referred to a regional center to rule out the possibility of prenatal exposure or developmental disabilities.

The report further stated that mother had contacted James and informed him that she relocated to Las Vegas and had no intention of returning. Although mother failed to respond to the Department at that time, the Department had completed a preliminary interview with mother prior to the detention hearing. Mother's explanation for initially calling the Department differed from what she had previously stated. She did not acknowledge that she no longer wanted to care for Jada or that there had been a conflict between her and James. She claimed that her sister had blackmailed her and said, "If you don't call CPS I will." Mother claimed that her sister thought that James and his sister could not take care of Jada, but mother refuted this claim. Mother stated that she met James while she was walking and he

stopped her. They maintained communication throughout her pregnancy while she lived in Las Vegas and he lived in California.

Mother moved to California after Jada was born to live with James and his sister Brandy. She stated that, since that time, James had helped care for Jada. According to mother, they would take turns waking up and feeding Jada and changing her diaper. When mother had things to do, James or his sister would watch the baby. Mother stated that she wanted to reunify with Jada after completing court ordered classes. As of the time of the report, mother had participated in two monitored visits with Jada and did not appear well bonded with the child, nor did she appear to engage with or adequately supervise the child. At a visit monitored by the caregiver, mother did not touch the child or help care for her but seemed "consistently distracted and fearful of [James] who was watching from nearby."

In May 2021, a social worker spoke with James. He reported that he lived between the home of his mother, grandmother, and sister. James had been raised by his grandmother because his mother was physically abusive and had untreated mental health and substance abuse issues. James stated that he has two children who reside with their mother in Lancaster. He stated that he can visit his children in Lancaster but their mother does not allow him to take the kids anywhere or visit them alone. He did not know why this was the case. James stated that he would like to care for Jada, whom he considers family, and stated that his family all love Jada. He denied any knowledge of Jada's biological father.

James had been in a relationship with mother since she was three months pregnant with Jada but did not know the

status of their relationship since she had disappeared and had not been in contact with him since. James stated that he regularly cared for Jada when mother had to run errands and that they took turns caring for Jada when mother was home. James stated that that mother seemed to need help caring for Jada and that he "was doing the most stuff." He claimed that he knew how to care for kids. James stated that Jada "used to always say daddy a lot" and that he taught her how to walk. He denied knowledge of mother's substance abuse history and current use and could not recall whether she had a mental health diagnosis or was being treated for mental health problems.

A social worker also spoke with James' grandmother, Annette W., who raised him. She felt that James was capable of caring for Jada and had no concerns about the child's safety in his care. She stated, "He loves that baby. . . . He hasn't spoken to me about wanting to be the father for the baby, but he really raised that baby really." Annette stated that she never saw mother caring for Jada on her own and that James was always caring for Jada regardless of mother's presence.

James' sister, Ashley W., also spoke with a social worker. She stated that James was staying with her after he fell out with their other sister, Brandy. Ashley stated that mother frequently left Jada with James without warning or stating when she would return. James would often tell mother that she needed to pay attention to her baby. Ashley witnessed James with the baby on his chest, feeding and playing with her. She stated that James was good with Jada.

At the time of the report, James had met with the Department regarding visitation, but a schedule remained pending.

In a last minute information report filed before the jurisdictional hearing, the Department informed the court of the results of a multidisciplinary assessment team (MAT) report concerning Jada. The child scored below the cutoff score in multiple categories of the 16-month-old questionnaire, including communication, fine motor, problem solving, and personal-social abilities, which indicated that these were areas of significant need and further assessment. The report recommended that Jada be referred to a regional center.

The report also conveyed the Department's concerns about James' ability to provide care and supervision to Jada and his relationship with mother. The Department noted that James is the father to two children whose mother does not allow him to have unmonitored contact with the children and that he claimed that he does not know why he does not have custody or why his contact must be supervised. The Department also noted that James and his relatives claimed that he spent a significant amount of time caring for Jada and that he taught her to walk and talk, but Jada is nonverbal due to her age and was not walking at the time of her placement. Jada also did not appear to have had any medical care and lacked developmental skills appropriate for her age.

The Department also had concerns that James was possibly mother's pimp. Jada's caretaker also expressed concerns that James was mother's pimp and that he had sexually abused the child. The caretaker believed that, before entering care, the child "was grossly abandoned to grow up on her own" and that "[s]he had been abused and there was a lot of sexual behavior that was a shock to [the caretaker] that was inappropriate for a child at her age." The caretaker further stated, "Besides never being

taken care of a doctor [*sic*], the child has been grossly abandoned and used for whatever purpose. If this man says he was in charge of this child, I would say he has done the lousiest job of any parent. The child's needs were grossly disregarded." The caretaker also recalled that, during a monitored visit with mother, James appeared to be controlling mother from a distance. Mother did not seem to be present and was looking over at James, who was standing quite a distance away. At another visit, mother was on the phone with a man (possibly James) and it appeared to the child's caretaker that "he wasn't talking to the child, he was talking loud to control the woman. He was saying, 'Jada, we're going to get you back. Mommy and daddy are going to get you back.' " It seemed to the caretaker that James was being manipulative.

In June 2021, a social worker had received a text message from James stating that he was moving back to Las Vegas and asking if the case could be transferred there. The social worker informed him that it could not be transferred and asked James to have mother contact the Department. Mother informed the Department that she and James would be living with James' brother. She further stated that she was not visiting the child at the time because James' sister stole her money so she was not able to buy anything for the child. The Department recommended that the court not name James the presumed father of the child.

At a hearing in July 2021, the court preliminarily found that there was insufficient evidence to support James' request for presumed father status but continued the jurisdictional hearing to give James an opportunity to brief the issue.

In a further last minute information report to the court, the Department stated that Jada was assessed by a regional center

and did not meet the criteria for services. However, at a well child exam, she failed to meet the expectations for 18-month-olds with respect to fine motor skills and communication. The medical provider indicated that the child was developmentally delayed and would need close monitoring.

In August 2021, James filed his motion requesting presumed father status. At the jurisdictional hearing, the court sustained the amended petition, declared Jada a dependent of the court, removed the child from parental custody, and ordered the Department to provide family reunification services to mother. With respect to the request for presumed father status, James' counsel argued that Jada had lived with James for nine months of the first year of her life and that James had cared for her as if she were his biological daughter. Counsel argued that, although James was not Jada's biological father, he had stepped forward and assumed the duties of fatherhood and was entitled to presumed father status under the law. Counsel for Jada opposed the request, arguing that James had relied largely on the statements of his own family members, which she doubted, and that he had made "hardly any effort" since Jada was detained in March.

The court noted that it had read the reports and listened to the argument and was satisfied that James had not satisfied section 7611, subdivision (d). The court stated: "Merely living with them for a period of time is not enough. Since this case has been filed, his actions have done nothing to [i]nure to the benefit of this child. He hasn't had ongoing continued contact with this child. And I am finding that he is not a parent in this case."

James timely appealed.

## DISCUSSION

### 1. Substantial evidence supports the court's conclusion that James is not the presumed father of Jada.

James contends that the evidence clearly establishes that he received Jada into his home and held her out as his child within the meaning of section 7611, subdivision (d), and that he was therefore entitled to presumed father status. He further contends that this presumption was not rebutted. The Department argues that James has failed to demonstrate that the court erred as a matter of law in concluding that he was not entitled to presumed father status under section 7611 and that substantial evidence supports that James did not demonstrate a sufficient commitment to paternal responsibilities to be afforded the rights of a presumed father. We agree with the Department.

#### 1.1. Relevant Law

Dependency law distinguishes between "alleged," "biological," and "presumed" fathers, which determines the extent to which a father may participate in dependency proceedings and be entitled to certain rights. (*In re Mia M.* (2022) 75 Cal.App.5th 792, 806.) An alleged father is a man who may be a child's father but has not yet established either presumed father status or biological paternity, and who therefore is not entitled to custody, reunification services, or visitation. (*In re A.H.* (2022) 84 Cal.App.5th 340, 350.) A biological father is a man " 'who has established his paternity but has not established his qualification as a presumed parent.' [Citation.]" (*Ibid.*) A court may order reunification services for biological fathers " 'if they are in the child's best interest.' " (*Ibid.*) Finally, a presumed father is one entitled to a presumption of paternity pursuant to section 7611,

and who therefore is entitled to " 'all the rights afforded to parents in dependency proceedings, including standing, the appointment of counsel, and reunification services.' [Citation.]" (*Id.* at p. 349.)

Section 7611 sets out the requirements for presumed parent status. A person is presumed to be a child's father if he "receives the child into [his] home and openly holds out the child as [his] natural child." (§ 7611, subd. (d).) "In determining whether a man has 'receiv[ed a] child into his home and openly h[eld] out the child' as his own [citation], courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental. [Citations.]" (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1211 (*T.R.*); *W.S. v. S.T.* (2018) 20 Cal.App.5th 132, 145 [same].)

" 'In dependency proceedings . . . the purpose of section 7611 . . . is to determine whether the alleged father has demonstrated a sufficient commitment to his parental responsibilities to be afforded rights not afforded to natural fathers—the rights to reunification services and custody of the child.' [Citation.] If an individual can qualify for presumed father status based on his good deeds consistent with parental

13

responsibilities, it follows that under certain circumstances he can be disqualified by repugnant conduct that is detrimental to the child." (*T.R.*, *supra*, 132 Cal.App.4th at p. 1212.)

A man who claims entitlement to presumed father status has the burden of establishing by a preponderance of the evidence the facts supporting his entitlement. (*In re E.T.* (2013) 217 Cal.App.4th 426, 437; *T.R.*, *supra*, 132 Cal.App.4th at p. 1210.) The presumption that arises under section 7611, subdivision (d) "is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence." (§ 7612, subd. (a).)

On appeal, we review a trial court's finding of presumed parent status for substantial evidence. (*County of Orange v. Cole* (2017) 14 Cal.App.5th 504, 509.) Under this standard, we may reverse only if " 'the evidence compels a finding in favor of the appellant as a matter of law.' [Citations.]" (*Estate of Herzog* (2019) 33 Cal.App.5th 894, 904, disapproved of on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) We are further directed "to presume that the trial court made all factual findings necessary to support the judgment so long as substantial evidence supports those findings." (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462; *Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792–793, superseded by statute on another ground as stated in *In re Zacharia D.* (1993) 6 Cal.4th 435, 448.)

### 1.2. Analysis

Although there are no factors that a court must consider in determining whether substantial evidence supports that the claimed father received the child into his home (*W.S. v. S.T.*, *supra*, 20 Cal.App.5th at p. 145), we will use the factors set forth

in *T.R.* as a framework for our analysis, to the extent they are relevant.[2]

The first four factors—"[1] whether the man actively helped the mother in prenatal care; [2] whether he paid pregnancy and birth expenses commensurate with his ability to do so; [3] whether he promptly took legal action to obtain custody of the child; [and] [4] whether he sought to have his name placed on the birth certificate" (*T.R.*, *supra*, 132 Cal.App.4th at p. 1211)—do not support a finding of presumed father status. James met mother when she was three months pregnant and is not the biological father of Jada. James and mother did not live together during her pregnancy and there is no evidence that he provided financial support to her during her pregnancy. James was not present at Jada's birth and did not sign her birth certificate. Prior to the dependency proceeding, James took no action to place his name on Jada's birth certificate or to establish paternity by legal action.

We recognize that certain evidence concerning the fifth factor—"whether and how long he cared for the child" (*T.R.*, *supra*, 132 Cal.App.4th at p. 1211)—supports James' claim. The record supports that mother and Jada lived with James and his sisters for approximately a year, from April 2020 to March 2021, and that he provided care to the child during this time, even when mother failed to do so.

---

[2] The eighth factor—"whether he provided for the child after [the child] no longer resided with him" (*T.R.*, *supra*, 132 Cal.App.4th at p. 1211)— does not appear relevant, as the child lived with James from shortly after her birth until she was detained. Similarly, there is no evidence concerning "whether, if the child needed public benefits, [James] had pursued completion of the requisite paperwork." (*Ibid.*)

However, there is also substantial evidence indicating that the care Jada received from James during this period did not demonstrate a commitment to her wellbeing. Mother informed social workers that James had told her to relinquish Jada to the Department because he said he only wanted to be with her. She stated that James did not know how to care for Jada and told mother to give Jada water rather than milk. Mother further stated that James would discipline the child, who was then one year old, by picking her up by her onesie and slamming her on the bed.

Prior to being detained, Jada had never seen a doctor or received immunizations. Her caretaker reported that the child was nonverbal, was not walking, and lacked developmental skills appropriate for her age. Medical assessments performed when the child was 16 and 18 months old concluded that she had several areas of significant need with regards to her development, which would require ongoing assessment. Her caregiver expressed concerns that Jada had been severely neglected and sexually abused based on concerning behaviors she exhibited. The caregiver further stated that, if James was responsible for Jada, he had done "the lousiest job of any parent."

With respect to the sixth factor, there is not "unequivocal evidence" that James held Jada out as his own child. (*T.R.*, *supra*, 132 Cal.App.4th at p. 1211.) Although James stated in the Judicial Council form he filed that he told everyone he knew that Jada was his child, his family knew that he was not Jada's biological father. One of his sisters stated that James was Jada's father, but his grandmother told the Department that James never spoke to her about wanting to be Jada's father. There is very little evidence with respect to the seventh factor, which

16

concerns "the number of people to whom he had acknowledged the child." (*Ibid.*) Apart from the form James filed, there is nothing in the record indicating that he held himself out as Jada's father to friends, acquaintances, or strangers.

Finally, we consider whether James' relationship with Jada was "merely incidental" to his relationship with mother. (*T.R.*, *supra*, 132 Cal.App.4th at p. 1211.) There is evidence that James cared for Jada even when mother neglected the child and disappeared for extended periods of time, which indicates that he had a relationship with the child independent of his relationship with mother. However, as we have discussed, there is also substantial evidence that James only wanted a relationship with mother and that he told mother to relinquish Jada to the Department.[3]

We conclude that there is substantial evidence to support that, individually and collectively, the factors identified by the *T.R.* court weigh against a finding of presumed father status under section 7611, subdivision (d). The evidence supports that James made no attempt to become Jada's legal father prior to the dependency proceeding, that he did not unequivocally hold her out as his child, and that he did not " 'demonstrate[] a full commitment to his paternal responsibilities—emotional, financial, and otherwise[.]' " (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801–802.) In reaching this conclusion, we reject James' contention that we should disregard the statements of mother and the caretaker, which he contends are not credible. "We may

---

[3] "The testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence, inconsistent or false as to other portions." (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 366.)

not reweigh a judgment 'supported by substantial evidence even if substantial evidence to the contrary also exists.' [Citation.]" (*City of San Buenaventura v. United Water Conservation District* (2022) 79 Cal.App.5th 110, 120.)

James contends that we may only affirm on the grounds articulated by the trial court—that is, that merely living with mother and Jada was insufficient, that James did nothing to benefit the child since the case was filed, and that he failed to maintain contact. He claims that the Department did not raise the so-called "negative allegations" against James at the hearing, the court did not consider them, and we may not consider those allegations on appeal.

These contentions are factually and legally unsupported. The Department identified negative allegations concerning James in multiple reports and repeatedly recommended to the court that James not be found the presumed father. The court expressly stated that it considered the Department's reports before it issued its ruling on James' request to be named presumed father. Further, as we have stated, we "presume that the trial court made all factual findings necessary to support the judgment so long as substantial evidence supports those findings." (*SFPP v. Burlington Northern & Santa Fe Ry. Co.*, *supra*, 121 Cal.App.4th at p. 462.) In other words, we are required to uphold both the express *and* implied findings of the court that are supported by substantial evidence.

James further argues that the court's consideration of his failure to maintain contact with Jada after she was detained was

error.[4] In support of this claim, James relies on *In re L.L.* (2017) 13 Cal.App.5th 1302, 1312 (*L.L.*), in which the court concluded that, if an individual seeking presumed father status "showed he met the requirements of section 7611, subdivision (d), at some point in [the child's] life, his subsequent failure to continue to meet those requirements . . . did not rebut the presumption that he is a presumed father under that statute."

However, the juvenile court in *L.L.* concluded that substantial evidence supported that the biological father *was* the presumed father of the child. (*L.L.*, *supra*, 13 Cal.App.5th at p. 1309.) Thus, the question before the Court of Appeal was whether the evidence compelled the conclusion that the biological father was not a presumed father as a matter of law. The court found that substantial evidence supported that the biological father had consistently visited the child for four and a half years, successfully obtained joint legal custody and visitation of the child, supported the child's mother financially, and told family, friends, and strangers that the child was his. (*Id.* at pp. 1309, 1313–1314.) It concluded that "the fact that [the biological father] went to prison in 2011 and no longer maintained that relationship with [the child] did not preclude him from qualifying as a presumed parent under section 7611, subdivision (d), as of the January 23, 2017 hearing." (*Id.* at pp. 1314–1315.)

---

[4] As a preliminary matter, the court's finding that James had not maintained contact with the child was supported by substantial evidence. Although James spoke with a social worker regarding visitation, we find no evidence in the record that he ever visited Jada. There is evidence that James was present during one of mother's visits with Jada, but the record does not indicate that he engaged with the child. Rather, his presence appeared to intimidate and distract mother.

Thus, *L.L.* does not stand for the proposition that a court errs when it considers whether an individual seeking presumed father status maintained contact with the child. Rather, the court in *L.L.* declined to hold that the absence of ongoing contact with the child precludes a man from obtaining presumed father status as a matter of law. Here, James' failure to maintain contact with Jada was clearly relevant to the court's determination of whether he had displayed a commitment to parental responsibilities, particularly as other evidence weighed against a finding of presumed father status. We perceive no error in the court's consideration of and reliance on this evidence.

Finally, James suggests that evidence that he engaged in negative conduct with respect to the child is only relevant in determining whether the presumption of presumed father status was rebutted, not whether he was entitled to the presumption in the first instance. We disagree. "[T]he court may consider *all* the circumstances when deciding whether the person demonstrated a parental relationship by holding out the child as his or her own and assuming responsibility for the child by receiving the child into his or her home. [Citations.]" (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 774, italics added.)

Further, *T.R.*, the case on which James relies in support of this contention, undermines his claim. In *T.R.*, the stepfather of the child sought presumed father status. Although he did not know the child until she was three years old, there was "substantial evidence that he openly acknowledged [the child] as his daughter, provided financial support, and received her in his home." (*T.R.*, *supra*, 132 Cal.App.4th at p. 1211.) However, the court stated that these "positive factors cannot be viewed in a vacuum," and evidence that the stepfather had been convicted of

20

and imprisoned for molesting young girls and had also molested the child "more than counterbalanced the factors favoring [his] presumed father status." (*Id.* at p. 1211.) The court concluded that substantial evidence supported that the stepfather was not a presumed father. (*Id.* at pp. 1211–1212.) It further concluded that, even "[a]ssuming arguendo that the juvenile court should have applied the section 7611, subdivision (d) presumption of presumed father status, the error was harmless because the presumption was more than amply rebutted." (*Id.* at p. 1212.) Thus, the stepfather's misconduct was relevant both to the court's determination of whether a presumption of presumed father status was merited in the first instance *and* to whether the presumption was rebutted.

Moreover, although the caretaker expressed concern that the child may have been molested, the so-called "negative allegations" in this case also pertained largely to the question of whether James cared for Jada, one of the factors that courts consider in determining whether the presumption has been established. (*T.R.*, *supra*, 132 Cal.App.4th at p. 1211.) For example, the child had significant developmental delays in several areas, which her caretaker believed were the result of severe neglect. We decline to hold that a court may only consider evidence that the individual seeking presumed father status neglected the child's emotional and physical needs when determining whether the presumption has been rebutted.

In sum, having considered the evidence in its totality, we cannot conclude that the court erred as a matter of law in finding that James did not meet his burden of proof for establishing that he was entitled to presumed father status under section 7611, subdivision (d).

21

## DISPOSITION

The order denying James T. presumed father status is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

HEIDEL, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.