Filed 1/17/24  Gutierrez v. Liu CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| PABLO S. GUTIERREZ et al., Plaintiffs and Respondents, v. FEI JUNG LIU et al., Defendants and Appellants. | D083004 (Super. Ct. No. CIVDS1914561) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Brian S. McCarville, Judge.  Affirmed.

Law Offices of Vincent Y. Lin, Vincent Y. Lin and Vincent Chan for Defendants and Appellants.

Gusdorff Law and Janet R. Gusdorff; Elder & Spencer, Chandra Gehri Spencer, Margaret Elder, and Lanetta Rinehart for Plaintiffs and Respondents.

Defendants Fei Jung Liu and Oscar Wen Chieh Lin appeal from an order denying their motion to vacate a default and default judgment that the trial court entered against them and in favor of plaintiffs Pablo S. Gutierrez and Gricelda San Martin.  The defendants contend the trial court erred in

two ways.  First, they argue the court should have granted their motion under Code of Civil Procedure section 473, subdivision (d),[1] because the default and default judgment were void for ineffective service of process. Second, they argue that—even if the service of process *was* effective—the default and default judgment should nonetheless have been vacated pursuant to section 473.5; section 473, subdivision (b); and principles of equity.  We disagree.  Thus we affirm.

## I.

## INTRODUCTION

### A.      The Parties

The plaintiffs are tenants who leased a residential apartment.

The defendants are a husband and wife who owned and managed the complex in which the apartment is located.  They each use several different names; and, in distinguishing among those names,[2] their counsel refers to "Oscar" and "Rachel" as "their first names," and to the other names as their "Chinese names."  We refer to the defendants primarily by the first names used by their counsel (Oscar and Rachel).  We do so for the sake of clarity, intending no disrespect.

### B.      The Claims Alleged in the Complaint

The essence of the claims the plaintiffs have alleged in their complaint is that they entered into a lease to rent an apartment in the complex owned and managed by Oscar and Rachel (the lease) and that, throughout the term of the lease, the apartment was plagued with plumbing, electrical, and

---

[1]     All further statutory references are to the Code of Civil Procedure.

[2]     The husband goes by:  Oscar, Oscar Wen Chieh Lin, Lin Oscar Wen Chieh, Lin Oscar Wen Chieh Lin, Chieh, Lin, and Wen Chieh Ho.  His wife goes by:  Rachel, Fei Jung Rachel Liu, Fei Jung Liu, and Liu.

heating problems, an insufficiency of smoke detectors, a severe cockroach infestation, and mold. According to the allegations in the complaint, the plaintiffs repeatedly brought these deficiencies to Oscar and Rachel's attention, and the code enforcement division of the city in which the apartment complex is located issued a notice requiring that the property be brought into compliance, but Oscar and Rachel refused to make repairs. Instead (according to the complaint), they retaliated by threatening, harassing, and intimidating the plaintiffs, and by raising the rent.

### C. The Matters at Issue on Appeal

While matters pertaining to the condition of the apartment are the crux of the complaint, the appeal turns not on an inquiry into such matters, but rather on whether service of process on Oscar and Rachel was effective; and, if so, whether Oscar and Rachel's delay of over three years in responding to the complaint should nonetheless be excused.

We begin by examining the effectiveness of service.

## II.

## EFFECTIVENESS OF SERVICE

Few principles are as fundamental to the administration of law as the principle that compliance with procedures for service of process is necessary in order for the court to attain personal jurisdiction over a party. Indeed, it is a matter of constitutional due process, such that, "if a default judgment [is] entered against a defendant who was not served with a summons as required by statute, [then] the judgment is void, as the court lacked jurisdiction in a fundamental sense over the party and lacked authority to enter judgment." (*Kremerman v. White* (2021) 71 Cal.App.5th 358, 370 (*Kremerman*).) Consequently, when a judgment is void for improper service of process, section 473, subdivision (d), of the Code of Civil Procedure empowers a court

3

to set the judgment aside.  (See Code Civ. Proc., § 473, subd. (d); *Kremerman, supra,* at p. 369.)

But, whereas "a trial court retains discretion [under section 473, subdivision (d),] to grant or deny a motion to set aside a *void* judgment," it "has *no* statutory power under section 473, subdivision (d) to set aside a judgment that is *not* void."  (*Kremerman, supra,* 71 Cal.App.5th at p. 369, italics added.)  Thus, when a reviewing court is asked to reverse an order denying a request under section 473, subdivision (d), to set aside a default judgment, the first question that must be resolved is whether the default judgment is in fact void.  If it is not void, then subdivision (d) does not offer a party a means by which the judgment can be set aside.

Whether a judgment is void is a question of law; thus, we review the court's conclusion de novo.  (*Kremerman, supra,* 71 Cal.App.5th at p. 369; see also *Sakaguchi v. Sakaguchi* (2009) 173 Cal.App.4th 852, 858; *Cruz v. Fagor America, Inc.* (2007) 146 Cal.App.4th 488, 495-496.)

## A. The Requirements for Service of Process by Substitute Service

Appellants contend that the default judgment against them is void because service on them was improper.  In assessing their argument, we begin by noting that among the permissible methods for service of a summons in California are personal service under section 415.10 and substitute service under section 415.20, subdivision (b).  Whereas section 415.10 states that a "summons may be served by personal delivery of a copy of the summons and of the complaint to the person to be served," section 415.20, subdivision (b), states that:

> "If a copy of the summons and complaint cannot with
> reasonable diligence be personally delivered to the person
> to be served, . . . a summons may be served by leaving a
> copy of the summons and complaint at the person's . . .

4

usual place of business . . . in the presence of a . . . person apparently in charge of his or her office [or] place of business, . . . at least 18 years of age, who shall be informed of the contents thereof, and by thereafter mailing a copy of the summons and of the complaint by first-class mail, postage prepaid to the person to be served at the place where a copy of the summons and complaint were left."

In interpreting the text of sections 415.10 and 415.20, courts have concluded that, " '[o]rdinarily, . . . two or three attempts at personal service at a proper place should fully satisfy the requirement of reasonable diligence and allow substituted service to be made.' " (*Espindola v. Nunez* (1988) 199 Cal.App.3d 1389, 1392; see also *Kremerman, supra,* 71 Cal.App.5th at p. 373; *Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1202; *Bein v. Brechtel–Jochim Group, Inc.* (1992) 6 Cal.App.4th 1387, 1391-1392 (*Bein*).)

The " 'evident purpose' " of section 415.20 is not to guarantee that papers being served are received by the person on whom they are intended to be served, but rather " 'to permit service to be completed upon a good faith attempt at physical service on a responsible person . . . [citation] . . . whose 'relationship with the person to be served makes it more likely than not that [the person being physically served] will deliver process to the named party.' " (*Bein, supra,* 6 Cal.App.4th at p. 1393, italics omitted). In keeping with this evident purpose, a panel of this district concluded in the *Bein* case that a guard at the entrance of a gated community was "a person apparently in charge" of the defendant's business for the purpose of compliance with section 415.20 (*Bein,* at p. 1390; accord, *id.* at pp. 1392-1394), and a panel of the Second District Court of Appeal concluded in *Ludka v. Memory Magnetics International* (1972) 25 Cal.App.3d 316 (*Ludka*) that a trial court "could well find" that the receptionist serving a group of co-located businesses sharing "a common reception area" "was the person who was apparently in charge" of

5

the defendant's business for purposes of section 415.20 compliance. (*Id.* at p. 321.) With the foregoing principles in mind, we now turn to the service of process that occurred in this case.

## B.     The Substitute Service in this Case

In this case, sworn declarations of due diligence signed by registered California process server David Alvarez indicate that Alvarez attempted, over the course of three consecutive days in May 2019, to personally serve copies of the summons and complaint on "Lin Oscar Wen Chieh" and "Fei Jung Liu" (i.e., Oscar and Rachel) at an address known as "5001 Lindsay Court, Chino, CA 91710."[3] Service was unsuccessful on the first day because the "business [was] closed;" and it was unsuccessful on the second and third day because the persons sought to be served were "not in." Thus, on the afternoon of the third day, Alvarez resorted to substitute service. He did so by leaving copies of the summons and complaint with or in the presence of an individual named "Alma Bobadilla," who he described as "a person at least 18 years of age apparently in charge at the office or other place of business of the person to be served" (i.e. 5001 Lindsay Court); by "inform[ing] [Bobadilla] of the general nature of the papers" and by then mailing copies of those same documents later the same day, via first-class, with postage prepaid, addressed to "Lin Oscar Wen Chieh" and to "Fei Jung Liu," at the 5001 Lindsay Court address.

---

[3]     As we discuss below, the Lindsay Court address and the name "Fei Jung Rachel Liu" appear, immediately below Rachel's signature, in the landlord signature block of the lease.

### C. The Plaintiffs' Outreach to the Defendants After the Substitute Service; and the Default Proceedings

#### 1. The Service of Statements of Damages

Toward the end of July 2019, having received no response to the complaint, the plaintiffs' counsel caused two statements of damages (one for each plaintiff) to be served on Oscar and Rachel in the same manner in which copies of the summons and complaint had been served on them 11 weeks earlier. In sworn proofs of service and declarations of mailing, registered California process server Delbert Salgado attests that he hand-delivered copies of the statements to Bobadilla at the 5001 Lindsay Court address, informed Bobadilla of the statements' general nature, and then (the same day or the next day) mailed copies of the statements to Oscar and Rachel at that same address. The statements were accompanied by cover letters from the plaintiffs' counsel, stating:

> "Our office is sending this letter as a courtesy prior to beginning default proceedings against you. Please be advised that if we do not hear from you within two weeks from the date of this letter, we will be forced to file a Request for Entry of Default and seek a judgment against you."

The addressee's name that appeared on the statements of damages, and on the cover letter, that Salgado hand-delivered and mailed to the 5001 Lindsay Court address for Oscar was identical to the addressee's name that appeared on the summons and complaint for Oscar: "Lin Oscar Wen Chieh." Likewise, the addressee's name that appeared on the statements of damages, and on the cover letter, that Salgado hand-delivered and mailed to that address for Rachel was identical to the addressee's name that appeared on the summons and complaint for Rachel: "Fei Jung Liu."

### 2. The Default Proceedings and the Plaintiffs' Additional Efforts to Engage the Defendants

In September 2019, having still received no response from Oscar or Rachel, plaintiffs' counsel filed requests for entry of default. Later that same month, the clerk entered Oscar and Rachel's defaults. Then, in March and June 2020, plaintiffs' counsel made additional attempts to engage Oscar and Rachel—by sending documents via courier and via e-mail to what they believed (incorrectly) to be Oscar and Rachel's home address and Oscar's e-mail address. Thereafter, on three separate occasions during the ensuing 21 months (in December 2020, June 2021, and April 2022), plaintiffs' counsel mailed copies of prove-up packages to Oscar and Rachel—again addressed to "Lin Oscar Wen Chieh" and "Fei Jung Liu"—at the 5001 Lindsay Court address.

In April 2022, the court entered a default judgment for the plaintiffs and against Oscar and Rachel, totaling $142,347.80 in damages, fees, and costs; and, in May 2022, plaintiffs' counsel caused a notice of entry of judgment to be mailed to Oscar and Rachel—again addressed as "Lin Oscar Wen Chieh" and "Fei Jung Liu"—at the 5001 Lindsay Court address.

### A. The Enforcement Efforts, the Defendants' Ultimate Engagement with the Plaintiffs, and the Motion to Vacate

In June 2022, as part of an effort to enforce the judgment, the plaintiffs obtained an order for appearance and examination (ORAP) addressed to Oscar and an ORAP addressed to Rachel. According to sworn proofs of service signed by Jim Zimmer, the third registered California process server to surface in this case, Zimmer personally served Oscar's ORAP on Oscar on June 21, 2022, and then personally served Rachel's ORAP on Rachel on August 22, 2022, both at the 5001 Lindsay Court address.

8

But, according to sworn declarations of Oscar and Rachel, service of the ORAPs transpired differently. Oscar and Rachel say they did not receive either ORAP until August 22, 2022, when they say a warehouse worker retrieved the ORAPs and handed them to Oscar after having seen an unidentified individual place them on the dashboard of a vehicle in the parking lot at 5001 Lindsay Court. According to Oscar and Rachel, it was not until they spoke with their attorney three days later that they "first . . . learned about the lawsuit."

On September 15, 2022—three and a half weeks after the date they say they first became aware of the lawsuit, but more than 12 weeks after the date Zimmer says he personally served Oscar—Oscar and Rachel filed a motion to vacate the default and default judgment. In support of this motion, they submitted a brief; a two-page declaration of Oscar and a nearly identical two-page declaration of Rachel, each dated September 14, 2022; the Alvarez proofs of service of process attesting to substitute service of copies of the summons and complaint, some three years and four months earlier; a proposed answer to the complaint; and a set of four pages, as to which no foundation was laid, that appear to have been printed from the internet during August of 2022 and that display bits of information associating each of three businesses (MTL International Trade Inc., Mad Hornets, and SH Logistics Inc.) with the 5001 Lindsay Court address. The moving papers did not include a declaration from the person—Alma Bobadilla—to whom process server Alvarez had attested to having hand-delivered copies of the summons and complaint three years and four months earlier, and to whom process server Salgado had attested to having hand-delivered the statements of damages two months after that. Nor did it include any other evidence.

9

The plaintiffs filed opposition papers, and Oscar and Rachel filed a reply. Thereafter, the plaintiffs deposed Bobadilla, the parties on both sides filed supplemental briefs along with a copy of the Bobadilla deposition transcript, and the motion was heard and denied.

Oscar and Rachel then timely appealed.

## B. Analysis and Additional Facts

On appeal, Oscar and Rachel appear to accept all of the statements in the Alvarez proofs of service of summons at face value, except for one. That one statement to which they take exception is the assertion that Bobadilla was a "person apparently in charge of . . . [their] office or other place of business" (Code Civ. Proc., § 415, subd. (b)) within the meaning of section 415.20. Their challenge to this statement is the basis for their position that the substitute service was ineffective.

In support of this position, Oscar and Rachel acknowledge that Bobadilla is the receptionist at 5001 Lindsay Court. But they invite the court's attention to a convergence of three circumstances that they contend rendered Bobadilla not "a person apparently in charge," and the substitute service thus ineffective. First, they assert that the building at 5001 Lindsay Court houses four different businesses, rather than just the one business—a company named QMH—that they acknowledge is their place of business. Based on this circumstance, they invoke an analogy to argue that:

> "If a four story building held four companies, one per floor[,] a process server should be required to go to the pertinent floor to serve a defendant, and not simply drop [the item being served] off with a person collecting mail for all four companies.
>
> "In this case, the person served was not apparently in charge of defendants' office, but simply a person charged to collect mail for four companies at the same building."

10

Second, Oscar and Rachel assert that Bobadilla "does not know" Oscar and Rachel," or at least "did not know [them] by name" or "did not know [their] Chinese names, but only their first names"—the implication being that, even if Bobadilla had had some sort of acquaintance with Oscar and Rachel in 2019, she nonetheless would not have known enough to realize that the "Lin Oscar Wen Chieh" and "Fei Jung Liu" whose names appeared on the copies of the summons and complaint that the process server left with her were the individuals she knew only as Oscar and Rachel.

Third, Oscar and Rachel assert that, even if Bobadilla had known them by their Chinese names, the protocols governing how items delivered to 5001 Lindsay Court are to be sorted and distributed to tenants would nonetheless have prevented her from seeing to it that items addressed to Oscar and Rachel were distributed to them directly. This, they say, is because the protocols required that any items addressed other than to Oscar and Rachel's employer, QMH, be placed in a bin that was accessible to all tenants in the building, so that employees of the various different tenants could search through the bin and retrieve whatever might be addressed to their businesses, their colleagues or themselves. According to their opening brief on this appeal (and in keeping with the deposition testimony of Bobadilla):

> "[W]hen [Bobadilla] receives mail or packages, the QMH mail stays with her, and all other mail goes into a bin [just behind the wall separating the reception area from the rest of the building's interior,] where the three other tenants and Oscar can go and look for it."

Thus, Oscar and Rachel argue, the way in which the copies of the summons and complaint were delivered to Bobadilla "is tantamount to going to a four story building with four business[es], one on each floor, [] simply handing documents to whoever the receptionist is on the ground floor instead of going

11

to the actual business," and expecting the documents to come into the possession of their intended recipients.

Oscar and Rachel's argument has a certain surface appeal, inasmuch as nothing in the record indicates that any of the items that the plaintiffs caused to be delivered or mailed to 5001 Lindsay Court was addressed to Oscar or Rachel in the care of QMH at that address; and it could be argued that the receptionist for a building that houses several different businesses might not know the name and employer of each individual who works in the building and might make no effort to ensure that deliveries make it to the proper person. But, as we explain below, we are not persuaded that the service of process that occurred in this case was defective.

We begin with an examination of evidence bearing on Oscar and Rachel's relationship to 5001 Lindsay Court and to their employer (QMH), and then turn to evidence bearing on Oscar and Rachel's relationship with Bobadilla, followed by evidence bearing on protocols for sorting and distributing items delivered to 5001 Lindsay Court.

### 1. The Defendants' Relationship to the Place of Business—5001 Lindsay Court—Where the Substitute Service Occurred

Oscar and Rachel acknowledge that "[w]e . . . work at QMH, Inc., located at 5001 Lindsay Ct, Chino." This statement is correct as far as it goes. But it obscures four pertinent facts: First, Oscar and Rachel own the property at 5001 Lindsay Court. Second, they control QMH. Oscar is its CEO, Rachel is its CFO, secretary, and agent for service of process, and the two of them, together, are the sole directors. Third, Oscar and Rachel have owned 5001 Lindsay Court and been affiliated with QMH since well before this lawsuit was filed. And fourth, 5001 Lindsay Court has long been Oscar

12

and Rachel's place of business, not only in their roles on behalf of QMH, but also in their roles as residential landlords.

In this latter regard, the 5001 Lindsay Court address appears in the pre-printed portion of a form that served as the template for the lease. Specifically, it appears in the landlord signature block, which reads: "Fei Jung Rachel Liu, 5001 Lindsay Ct., Chino, CA 91710." It also appears, added by hand, in a clause specifying to whom and how rent is to be paid. This provision states that "monthly rent . . . shall be paid to *Fei Jung Liu* [*at*] *5001 Lindsey Ct., Chino, CA 91710*" (italics added to distinguish text added by hand from pre-printed text). Neither of these clauses references QMH.[4]

A reference to 5001 Lindsay Court (but not to QMH) also appears in the pre-printed portion of another form—this one the template for a three-day notice that was sent to Gutierrez, directing him to pay rent. The notice to pay rent identifies "Fei Jung Liu" (i.e., Rachel) as the "Owner/Agent" of the apartment; and, in keeping with the instructions that were added by hand to the lease form, it states that "[p]ayment . . . shall be made to Fei Jung Liu . . . at 5001 Lindsay Ct. Ontario, CA 91710"—again without reference to QMH. This form also makes clear that tenants could "deliver[] payment [to that address] in person."

---

[4]    A reference to QMH *does* appear in a clause in which the lease identifies a different address where service of process "may" be delivered to the attention of "Wen Chieh Ho & Fei Jung Liu" at QMH. Inasmuch as the language in this clause is permissive ("may") rather than mandatory ("must"), and because neither party contends that this different address, instead of the Lindsay Court address, should have been used for service, we deem it of no consequence to our analysis.

13

### 2. The Defendants' Relationship with the Person—Receptionist Alma Bobadilla—Through Whom the Substitute Service Was Effected

In much the same way that Oscar and Rachel's statements about 5001 Lindsay Court downplay their connection to it, so too do their statements about Alma Bobadilla downplay their connection to her. This they do by portraying Bobadilla as an employee of the management of what they describe as a "huge warehouse," and themselves as merely employees of one of a number of commercial tenants in the building. Thus, for example, they state that "Bobadilla is not an employee of QMH," but that "[w]e do work at QMH." Moreover, they add, "[d]ue to the nature of our work, we often travel around the country and overseas" and, "[s]ince the outbreak of coronavirus . . . , we have been working from home" In this fashion, they insinuate that—apart from the fact that Bobadilla happened to work in the same building in which they sometimes worked—they had no meaningful connection to her.

But Bobadilla refutes this.

When asked at her deposition to say where she was employed and how long she had worked there, Bobadilla answered that her employer is, and since 2014 has been, QMH. Pressed further and asked whether "[t]he pay records that you get at the end of [the] year for your taxes . . . have QMH's name on them," she responded emphatically: "Of course they do."

When questioned about Oscar and Rachel, Bobadilla responded in ways that demonstrated she was well acquainted with each of them. By way of example: She described each of them as her "boss"—with one of them (Oscar) being her "direct supervisor," who had hired her eight years earlier and for whom she had worked ever since, and the other (Rachel) being "very nice" and "just a great boss to work for." Asked to describe Oscar's appearance, she

14

testified that he was about "five-[foot]-six, I think," "bald," "maybe in his 50s or 40s," about "140 pounds;" and she described Rachel as "pretty" with "short hair."

When asked about colleagues with whom she interacted, Bobadilla testified that, apart from Mandy in Accounting and Alberto and Luis in the warehouse, Oscar and Rachel were the only QMH personnel with whom she interacted. She further testified that, in 2019 (when the substitute service occurred), Oscar was present at the QMH premises at 5001 Lindsay Court about three or four days each week, and Rachel was there about one or two days each week. Thus, it is evident that Bobadilla was quite familiar with the defendants.

Our examination of the relationship between Bobadilla and Oscar and Rachel does not end here, however, because we must factor into our analysis the fact that Oscar and Rachel each use a variety of different names. In light of this circumstance, it is possible that a person with whom Oscar and Rachel engage in one facet of their lives (say, one of their employees) might know them only by a name or names with which a person who engages with them in a different facet of their lives (for example, a tenant) is not familiar. Indeed, this possibility appears—at least in part—to be an actuality here. For, when Bobadilla was asked in her deposition if she had ever heard of "Fei Jung Liu"—the name that was used by the defendants to refer to Rachel in the lease and in the notice to pay rent, and that was used by the plaintiffs to refer to Rachel in the summons and complaint—the name did not register with her:

> "Q. Have you ever heard of a person named—and I'm going to mispronounce this, I'm sure—Fei Jung Liu?
>
> "A. No.
>
> "Q. F-e-i, J-u-n-g, L-i-u?

15

"A. No."

Then, somewhat (but not entirely) similarly, when Bobadilla was asked if she had ever heard of Lin Oscar Wen Chieh—one of the amalgams of first name and Chinese names that is used by the defendants to refer to Oscar, and that the plaintiffs used to refer to Oscar in the summons and complaint—that name registered with her only in part:

> "Q. Have you ever heard of a person by the name of Lin Oscar Wen Chieh?
>
> "A. Oscar, but I don't know the other names."

### 3. The Protocols for Sorting and Distributing Items Delivered to 5001 Lindsay Court

As noted above, Oscar and Rachel assert that the building at 5001 Lindsay Court houses, not just QMH, but three other businesses as well; and Bobadilla confirms as much in the testimony she furnished at her deposition in 2022. Bobadilla also describes in that testimony the way in which items delivered to 5001 Lindsay Court were sorted and distributed to the four businesses:

> "Q. When you receive packages or mail for Oscar, what do you do with it?
>
> "A. If it's QMH, it stays with me. When it's a different name, I put it [in the bin].
>
> "[¶ . . . ¶]
>
> "Q. So when you receive packages with Oscar's name on them, where do you put them?
>
> "A. I put them in the [bin] where all the packages go.
>
> "Q. Where all the QMH packages go?
>
> "A. No, where all the [other tenants' packages] go. I only keep what I'm told to do which is just QMH, keep the packages of QMH."

16

"Q.: So you leave it up to [Oscar] to check in that bin for anything that belongs to him?

"A. Yes, that's how I was told to do."

"Q. And when you place packages for Oscar in that bin, have you ever noted that they were still in there for some period of time after you placed them in there?

"A. No, it's always gone. They pick up everything.

"Q. So everything gets picked up on a daily basis?

"A. Yeah . . . it's always gone by the next morning."

Arguably, Bobadilla's evidence with regard to how deliveries to 5001 Lindsay Court were sorted and distributed is of questionable utility inasmuch as it was stated in the present tense—which is to say that, while Bobadilla clearly was speaking to the number of businesses that operated, and to how deliveries were sorted and distributed, at 5001 Lindsay Court in 2022 (when the deposition occurred), it is unclear whether she also was speaking to such

matters as of 2019 (when the substitute service occurred).[5]  Nonetheless, because the parties appear to interpret this testimony as applicable to the 2019 timeframe, we do, too.

### C.    Conclusion with Regard to Effectiveness of Service

For purposes of this discussion, we accept that Bobadilla may not have been familiar with Oscar and Rachel's Chinese names, and we accept that the protocols for sorting and distributing deliveries to 5001 Lindsay Court in May of 2019 might have resulted in items addressed to "Lin Oscar Wen Chieh" and "Fei Jung Liu" not being delivered directly by Bobadilla to Oscar and Rachel.  But we nevertheless conclude that the evidence in this case supports a finding that Bobadilla was "a person apparently in charge" of Oscar and

---

[5]    The plaintiffs included, in their opposition submission, evidence tending to rebut the inference that QMH was just one of several business that occupied the premises at 5001 Lindsay Court and the inference that Bobadilla would have been responsible for receiving and distributing deliveries for businesses other than those operated by Oscar and Rachel.  By way of example, they presented (a) records on file with the Secretary of State and other sources of information revealing that one of the three other businesses that Oscar and Rachel identified as tenants at 5001 Lindsay Court (MTL) was suspended and had been inactive since 2016, and that the address of each of the other two such businesses (Mad Hornets and SH Logistics) was 500*5* Lindsay Court, rather than 500*1* Lindsay Court.  They also presented a declaration of counsel, buttressed by photographs, indicating that, notwithstanding the fact that these two different street numbers (5001 and 5005) attach to the same building, (b) each street number has its own separate entrance (i.e., there is one entrance that corresponds to 5001 Lindsay Court and an altogether different entrance that corresponds to 5005 Lindsay Court); (c) the signage at the exterior of the 5001 Lindsay Court entrance identifies no business other than QMH; and (d) the signage in the reception area just *inside* that entrance likewise identifies no business other than QMH.  But, except for the records on file with the Secretary of State, all of this evidence speaks to circumstances as they existed in 2022, not 2019.

18

Rachel's usual place of business within the meaning of section 415.20, subdivision (b).

Indeed, if the gate guard and shared receptionist in the *Bein* and *Ludka* cases (discussed *ante*) each qualify as "a person apparently in charge," then so, too, does Bobadilla: She was the proverbial gatekeeper with whom anyone making a delivery to 5001 Lindsay Court—including any tenant delivering a rent check pursuant to the instructions in Oscar and Rachel's lease and rent-notice forms—would be required to interface. She also was a direct report to Oscar and Rachel at a business they controlled on property they owned; and Oscar and Rachel had given her the responsibility for receiving and handling important items, such as rent payments, even if only to set such items aside in a bin for them to pick up later. These circumstances *alone* rendered her "a responsible person . . . [citation]. . . whose 'relationship with the person to be served makes it more likely than not that they will deliver process to the named party.' " (*Bein, supra,* 6 Cal.App.4th at p. 1393.)

Moreover, if we credit Oscar and Rachel's statements regarding the extent to which they traveled and worked remotely, and Bobadilla's testimony about the limited number and roles of the colleagues with whom she interacted—such that, in the absence of Oscar and Rachel, the only other individuals to whom Bobadilla might have referred a process server would have been a warehouse worker or an accountant—then: Who better to be deemed "a person apparently in charge" (not "*the* person . . . ," but, per the code, "*a* person apparently in charge" (italics added)) than the receptionist?

19

For these reasons, on the record presented, we conclude the substitute service was effective and that the default and default judgment are therefore valid, not void.[6]

Consequently, we now turn to the defense's assertion that the trial court erred in refraining from exercising its statutory and equitable discretion to excuse Oscar and Rachel's tardiness in responding to the complaint and to set aside the default and default judgment on grounds other than voidness.

### III.
### RELIEF NOTWITHSTANDING EFFECTIVENESS OF SERVICE

In examining the trial court's decision to refrain from excusing Oscar and Rachel's tardiness in responding to the complaint, we begin by observing that the court's rationale for denying Oscar and Rachel's motion is not revealed in the record.[7]  However, this circumstance does not prevent us from reviewing the trial court's ruling for error, as "[i]t is judicial action and

---

[6]    As a result of this conclusion, we need not consider  the exercise of the court's discretion in setting aside a judgment that is void. *Kremerman*, *supra*, 71 Cal.App.5th at p. 369.

[7]    The minute order that issued on the day the motion was argued states that, at the motion hearing, the trial court recited a tentative ruling and then, following oral argument, stated its findings on the record.  But the hearing transcript reveals that neither of these statements is correct. Instead, shortly after the hearing commenced, the trial court made passing reference to a tentative ruling; and then later, near the conclusion of the hearing, it stated that "the Court's tentative is the Court's order."  But the existence of a tentative ruling notwithstanding, we remain unaware of the trial court's reasoning because the parties did not include the tentative ruling in the record they assembled for this appeal.

not judicial reasoning which is the subject of review." (*El Centro Grain Co. v. Bank of Italy, etc.* (1932) 123 Cal.App. 564, 567; accord *United Pacific Ins. Co. v. Hanover Ins. Co.* (1990) 217 Cal.App.3d 925, 933; cf. *Howard v. Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 443 ["even if there is no indication of the trial court's rationale . . . , the court's decision will be upheld on appeal if reasonable justification for it can be found"].)

Here, the judicial action we review is the trial court's order implicitly rejecting each of three different grounds that Oscar and Rachel put forward as a basis on which to grant their request that the default and default judgment be vacated even if valid. Those three bases are: (1) Code of Civil Procedure section 473.5, which allows a court to set aside a default judgment where a party did not receive actual notice in time to defend the action; (2) Code of Civil Procedure section 473, subdivision (b), which empowers a court to "relieve a party . . . from a judgment . . . or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect"; and (3) the court's equitable powers. We address each of these three grounds, in this same sequence, below.

## A. Relief Based on Section 473.5 of the Code of Civil Procedure

The first of the three bases on which Oscar and Rachel contend the trial court should have granted them relief irrespective of the judgment's validity is section 473.5, which permits a court to grant relief from a default or default judgment in situations in which service of a summons, though valid, has not resulted in actual notice to a party in time for him to defend himself. (See also *Anastos v. Lee* (2004) 118 Cal.App.4th 1314, 1319 (*Anastos*).) Under that section, a trial court, in the exercise of its discretion, "may" set aside the default or default judgment—provided it makes certain findings of fact, including: that the party requesting relief did not receive

21

"actual notice" in time to defend himself; and that that party's lack of actual notice was "through no inexcusable fault of his own." (Judicial Council Com. 15 West's Ann. Code Civ. Proc. (2022 ed.) § 473.5, p. 239.)

Focusing on the use of the word "may" in subdivision (c) of section 473.5 and on the discretion it confers, some reviewing courts have stated, expansively, that a trial court's decision to grant or deny relief under section 473.5 is reviewed for an abuse of discretion. (See, e.g., *Rios v. Singh* (2021) 65 Cal.App.5th 871, 885 ["We review a trial court's decision to grant or deny relief under section 473.5 for abuse of discretion."]; accord *Sakaguchi v. Sakaguchi* (2009) 173 Cal.App.4th 852, 862.) However, parsing section 473.5 somewhat more closely than the courts in the cases just cited have had cause to do, we believe it is more precise to say that the trial court's exercise of its discretion *after the necessary factual findings have been made* is to be reviewed for an abuse of discretion; but that, inasmuch as reviewing courts "[g]enerally . . . apply the substantial evidence standard to a superior court's findings of fact" (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 461), the factual findings *themselves* must be reviewed under the substantial evidence standard. Be this as it may, we conclude that the trial court did not err irrespective of which standard of review is applied, because (as we explain below) under either standard, the evidence in the record supports the conclusion that, even giving Oscar and Rachel the benefit of the doubt with regard to their claim that they did not receive actual

22

notice in time to defend,[8] such failure of notice resulted from their own inexcusable neglect in failing to align their instructions to their tenants with the delivery protocols they communicated to their staff at 5001 Lindsay Court.

In this regard, the parties' lease recited "Fei Jung Liu [of] 5001 Lindsay Ct., Chino CA 91710" as the name and address of the landlord and "Fei Jung Liu [at] 5001 Lindsay Ct., Chino CA 91710" as the person and location to whom rent should be delivered. In similar fashion, the notice to pay rent made clear that any "[p]ayment . . . shall be made to Fei Jung Liu . . . at 5001 Lindsay Ct." Neither of these documents indicated that items to be delivered to "Fei Jung Liu" should be addressed to her in care of QMH at that location, and even if it had, the only difference would have been that Bobadilla would have set such items aside, presumably to route them at some point to Oscar or Rachel, rather than placing them in the bin for their later collection (as may have been the protocol for rent payments, for example).

Under these circumstances, and given the level of control that Oscar and Rachel exercised over operations at 5001 Lindsay Court and QMH, one

---

8     We view with skepticism Oscar and Rachel's testimony that they did not become aware of this lawsuit until August 25, 2022. That testimony not only is contradicted, at least with respect to Oscar, by the sworn statement of Zimmer, the professional process server who attests to having personally served Oscar on June 21, 2022. It also is impeached by the extent to which Bobadilla's testimony contradicts Oscar and Rachel's assertions about their connections to Bobadilla and their roles with regard to 5001 Lindsay Court and QMH. Moreover, Oscar and Rachel's credibility is further undercut by the body of evidence attesting to the multiplicity of occasions (starting in May 2019), and variety of methods, on and by which documents generated in this lawsuit were transmitted to Oscar and Rachel at their place of business.

would reasonably expect them to have instructed their staff responsible for receiving, sorting, and distributing mail and other incoming deliveries that "Fei Jung Liu" was Rachel, and that any incoming delivery addressed to "Fei Jung Liu" or to a name that included "Oscar" must be routed securely to Rachel, to Oscar, or to a person or persons within their organization who reported to them and knew what those names meant, instead of being placed in a bin for personnel of unaffiliated businesses to rummage through. Yet, according to Bobadilla, this is virtually the opposite of what she "was told to do." Further, if, as Oscar and Rachel would have us believe, the use of the bin had ever actually resulted in the loss of any important mail or deliveries, such as rent checks, there is no doubt that a responsible landlord / manager would have immediately changed that delivery protocol to ensure such loss would not happen again.

Moreover, if Oscar and Rachel's testimony regarding the frequency with which they travel and the extent to which they work remotely is to be credited, then it would have been even more incumbent upon them to see to it that the delivery-processing protocols to which their staff adhered were secure enough to ensure that items of potential importance that were addressed to Oscar and Rachel's Chinese names (or to amalgams of their first names and Chinese names) would be routed to their attention, or set aside for them, in a manner that would minimize the risk of their going astray.

In the absence of precautions such as those discussed above, we conclude that substantial evidence supports a finding that any lack of actual notice was the result of Oscar and Rachel's inexcusable neglect, and, therefore, that the trial court did not abuse its discretion in denying the motion to vacate the default judgment pursuant to section 473.5.

24

### B. Relief Based on Section 473, Subdivision (b), of the Code of Civil Procedure

We now turn to the second of the three bases on which Oscar and Rachel contend the trial court should have granted them relief irrespective of the judgment's validity:  section 473, subdivision (b).  That subdivision empowers a court to "relieve a party . . . from a judgment . . . or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect."  Inasmuch as this provision permits, but does not obligate, a trial court to grant relief when its requirements are met, it is discretionary.  We review the trial court's decision to deny relief under section 473, subdivision (b), for an abuse of its discretion. (See *Fasuyi v. Permatex, Inc.* (2008) 167 Cal.App.4th 681, 694 ["Section 473, subdivision (b) . . . is recognized as invoking the trial court's discretion, and the judgment of the trial court ' "shall not be disturbed on appeal absent a clear showing of abuse." ' " ].)

Applying this standard of review, we find no abuse of discretion here because, in order for a court to grant a motion for relief under section 473, subdivision (b), "the motion must be made within six months after entry of the default" and the "six-month period runs from entry of default, not entry of judgment" (*Manson, Iver & York v. Black* (2009) 176 Cal.App.4th 36, 42; accord *Pulte Homes Corp. v. Williams Mechanical, Inc.* (2016) 2 Cal.App.5th 267, 273, *Weiss v. Blumencranc* (1976) 61 Cal.App.3d 536, 541), and in this case that requirement has not been met.  "The six-month time limit . . . is jurisdictional and the court may not consider a motion for relief made after that period has elapsed." (*Manson,* 176 Cal.App.4th at p. 42; accord *Stevenson v. Turner* (1979) 94 Cal.App.3d 315, 318.)  Here, the default was entered on September 25, 2019, and the motion for relief was not filed until three years later, on September 15, 2022.  Thus, to the extent the request for

25

relief is premised on section 473, subdivision (b), the motion was untimely and the trial court was without jurisdiction to grant it.

## C. Relief Based on Principles of Equity

We now turn to Oscar and Rachel's third basis for requesting relief irrespective of the judgment's validity, namely equity. Our Supreme Court has held that, "[a]fter six months from entry of default, a trial court may . . . vacate a default on equitable grounds even if statutory relief is unavailable." (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 981, (*Rappleyea*).) A trial court may also grant equitable relief from a default *judgment*; however, it may do so "only in exceptional circumstances" because, once a judgment has been entered, the "strong public policy in favor of granting relief and allowing the requesting party his or her day in court" must yield to the "strong public policy in favor of the finality of judgments." (*Id*. at pp. 981–982.) The denial of a request that equity be invoked to set aside a default or default judgment is reviewed for an abuse of discretion. (*Id*. at pp. 978, 981, 984.)

In advocating that equity required the trial court to grant their motion in this lawsuit, Oscar and Rachel invoke a three-part inquiry that has been applied to motions for equitable relief from defaults and default judgments in a number of cases involving claims of extrinsic fraud or mistake: " 'First, the defaulted party must demonstrate that it has a meritorious case. Second[ ], the party seeking to set aside the default must articulate a satisfactory excuse for not presenting a defense to the original action. Last[ly], the moving party must demonstrate diligence in seeking to set aside the default once . . . discovered.' " (*Rappleyea, supra,* 8 Cal.4th at p. 982 [extrinsic mistake]; see also *Stiles v. Wallis* (1983) 147 Cal.App.3d 1143, 1147–1148 [claimed extrinsic mistake]; *In re Marriage of Stevenot* (1984) 154 Cal.App.3d

26

1051, 1070 [claimed extrinsic fraud].)  Our Supreme Court has referred to this three-party inquiry as "a stringent test."  (*Rappleyea,* at p. 982.)

In arguing that they meet this stringent test, Oscar and Rachel say the test's satisfactory-excuse element "normally . . . proves most important"; and they argue, with regard to this element, that:

> "Bobadilla's testimony that she did not know Liu and Lin's Chinese names, but only their first names and that any deliveries or mail other than addressed to QMH was put in a bin for three other companies and outside the general purview of QMH provide an excellent explanation."

But for the reasons articulated above in our discussion of section 473.5, we agree with the finding implicit in the trial court's ruling that the excuses offered by the defendants are not satisfactory; and this drives a conclusion that the trial court did not abuse its discretion when it refrained from drawing on its equitable powers to grant the requested relief.

## IV.

## DISPOSITION

The order is affirmed.  The plaintiffs are entitled to costs on appeal.


KELETY, J.


WE CONCUR:


HUFFMAN, P. J.


CASTILLO, J.

27